UNITED STATES of America, Plaintiff–Appellee

v.

William RAMOS, Defendant–Appellant.

UNITED STATES of America, Plaintiff–Appellee

v.

Richard RAMOS, Defendant–Appellant.

Nos. 92–6849, 92–7087.

United States Court of Appeals, Eleventh Circuit.

Jan. 21, 1994.

William B. Richbourg, Pensacola, FL, for defendant-appellant.

J.B. Sessions, III, U.S. Atty., George A. Martin, Jr., Asst. U.S. Atty., Mobile, AL, for plaintiff-appellee.

Before ANDERSON and CARNES, Circuit Judges, and SCHLESINGER *, District Judge.

SCHLESINGER, District Judge:

## I. INTRODUCTION

Appellants Richard Ramos and William Ramos each pled guilty to conspiracy to possess with intent to distribute cocaine, in violation of 21 U.S.C. § 846. Appellants' respective sentences included the imposition of a term of imprisonment of 120 months. On appeal each argues that the district court erred by denying two different joint motions to suppress, one involving the search of an Orange Beach, Alabama condominium ("the Alabama search"), the other involving the

* Honorable Harvey E. Schlesinger, U.S. District Judge for the Middle District of Florida, sitting by designation.

search of a trailer and hotel room in Austin, Texas ("the Texas search"). Appellant Richard Ramos also argues that the district court erred by refusing to allow him to withdraw his conditional plea of guilty.

Without discussion, we conclude that the district court did not err in denying the motion to suppress testimony and physical evidence derived from the Texas search. We also conclude that the district court did not err in refusing to allow Richard Ramos to withdraw his guilty plea. However, for the reasons discussed below, we find that the district court incorrectly concluded that William Ramos abandoned his expectation of privacy in the briefcase found during the Alabama search.

## II. BACKGROUND

Appellant William Ramos ("William") was the tenant of record for two different condominiums in the Back Bay Resort, located in Orange Beach, Alabama. He lived in these condominiums with his brother Appellant Richard Ramos ("Richard"). On July 28, 1991, William signed a five-month lease for Unit 408, but was transferred to Unit 606 on November 1, 1991, as 408 previously had been rented to someone else beginning November 1. William signed a new agreement for Unit 606 for a two-month period concluding January 1, 1992. Both units were managed by Meyer Realty ("Meyer"), which rented several units at that location on behalf of the individual units' owners. Each of these rental agreements specified on the front page that check-in time was between 2 P.M. and 5 P.M., and that check-out time was 10 A.M. Unit 606 was leased to another party for a period commencing on January 1, 1992.

Meyer had a contract with D.J.'s Cleaning ("D.J's") for the provision of housekeeping and cleaning services during the changeover periods between tenants. Debbie Anding, the owner of D.J.'s, was notified by Meyer on December 31, 1991 that the current tenants of Unit 606 would be leaving the next day. Accordingly, Anding sent two cleaners to Unit 606 on the morning of January 1, 1992. Katie Lester and Jeannie Williams arrived at Unit 606 at approximately 10 A.M., observed that the tenants were not out of the unit, and telephoned Anding with this information. Lester and Williams went to clean another unit, and Anding then met the two at Unit 606 sometime between 11:30 A.M. and 12 P.M.

When Anding arrived the tenants still had not moved out. Accordingly, Meyer instructed the cleaners to pack the personal effects into garbage bags so that the unit could be cleaned before the new tenants arrived. However, as the owner's closet had been opened, the cleaners had some difficulty determining what property belonged to the tenants and what belonged to the owner. The cleaners found two dollar bills, one in the owner's closet and one in the bathroom, each of which, according to Anding, had "white powder substance in it." Anding then found a briefcase on the floor of the master bedroom. Williams, her employee, tried to open the briefcase, but the right side was locked. When Williams peered inside through the unlocked left side she saw pieces of napkins wrapped by rubberbands. However, neither Williams nor Anding could determine what was wrapped inside the napkins, and could not determine whether the briefcase belonged to the owner or renter.

Anding relayed this situation to Kathy Fleming at the Meyer office, and told Fleming that there was "either drugs or money" in the briefcase. Fleming instructed the cleaners to unpack everything, and leave all the unit's items as they had found them. Gail Harris, Meyer's rental manager, notified the state police that her housekeepers had found a briefcase containing "what they thought to be cocaine," and asked them to send a trooper to Unit 606. Early that afternoon, Meyer's maintenance man escorted Trooper Warren Stewart to Unit 606. Stewart located the briefcase, observed some plastic bags while looking through the unlocked left side, and then opened the locked right latch with his pocketknife. Stewart field-tested a powder substance found in one of the bags within the briefcase. The substance

tested positive for cocaine. He relocked the suitcase, placed it under the bed and telephoned Agent Michael Kirk from the Drug Enforcement Administration task force in Mobile, Alabama. Later that afternoon they obtained a search warrant from an Alabama state judge for the purpose of expanding the search in Unit 606. The following day Harris received a message at the realty office that William Ramos had called.

Appellants and codefendant Christine Adkins were indicted for possession of cocaine with intent to distribute and conspiracy to possess cocaine with intent to distribute. After pleading not guilty, they filed the two joint motions to suppress. William testified briefly at the suppression hearing, and stated that he was the owner of the briefcase.

At the close of the suppression hearing on the Alabama search, the district court stated that this type of rental was a "very definite limited tenancy," and that when the time expires the owner, or the owner's agent (e.g., Meyer), has a right to enter or send agents or state troopers into the condo "to check on that condo." The court, in denying the motion, concluded that:

> And I'm of the opinion that the owner of the briefcase had abandoned his privacy rights in that briefcase because he had not checked out on time, something had to be done with that briefcase, and because it was left partially opened and a cleaning woman saw something in there that was suspicious, and the owner had every right to check to see what that was before they stored that briefcase or moved that briefcase. They did exactly the proper thing. They called the state trooper to come check the contents of that briefcase before they did anything with it.

> And I'm of the opinion that there was no privacy right in this briefcase at that time by the owner of that briefcase. So therefore, there could be no invasion of any privacy rights in that briefcase.

Subsequently, the district court entered a summary Order stating that the motion was denied at the hearing. The written Order did not discuss any of the merits of the motion.

By finding that Appellants had abandoned the briefcase, the district court implicitly found that Appellants had no standing to contest the legality of the Alabama search. Thus, the district court never reached any questions concerning the legality of the search itself.

After the court subsequently denied the motion to suppress concerning the Texas search, William and Richard pled guilty to the conspiracy charge. In their respective plea agreements, Appellants expressly reserved the right to appeal the district court's denial of the motions to suppress.

## III. DISCUSSION

 On appeal, William and Richard argue in part that the district court erroneously denied their motion to suppress the fruits of the Alabama search. As rulings on motions to suppress involve mixed questions of fact and law, the district court's factual findings are reviewed under the clearly erroneous standard, while that court's application of the law is subject to *de novo* review. *United States v. Banks*, 3 F.3d 399, 401 (11th Cir. 1993); *United States v. Garcia*, 890 F.2d 355, 358 (11th Cir.1989). Because the concept of abandonment "involves a factual issue," *United States v. McKennon*, 814 F.2d 1539, 1545 (11th Cir.1987), a district court's finding of abandonment is reviewed under the clearly erroneous standard, *United States v. Lehder–Rivas*, 955 F.2d 1510, 1521–22 (11th Cir.), *cert. denied sub nom. Reed v. United States*, —— U.S. ——, 113 S.Ct. 347, 121 L.Ed.2d 262 (1992).

 In determining whether there has been abandonment, the " 'critical inquiry is "whether the person prejudiced by the search ... voluntarily discarded, left behind, or otherwise *relinquished his interest in the property* in question so that he could no longer retain a reasonable expectation of privacy with regard to it *at the time of the search*." ' " *United States v. Winchester*, 916 F.2d 601, 603 (11th Cir.1990) (quoting *McKennon*, 814 F.2d at 1546 (citation omitted)). Whether abandonment occurred is a

question of intent which may be inferred from acts, words and "other objective facts." *United States v. Pirolli,* 673 F.2d 1200, 1204 (11th Cir.), *cert. denied,* 459 U.S. 871, 103 S.Ct. 157, 74 L.Ed.2d 131 (1982). While Appellants here bear the burden of proving a legitimate expectation of privacy in the areas searched, *Rawlings v. Kentucky,* 448 U.S. 98, 104, 100 S.Ct. 2556, 2561, 65 L.Ed.2d 633 (1980), the burden of proving abandonment is on the government. *See United States v. Freire,* 710 F.2d 1515, 1519 (11th Cir.1983), *cert. denied,* 465 U.S. 1023, 104 S.Ct. 1277, 79 L.Ed.2d 681 (1984).

■ An individual can urge suppression of evidence only if *his* Fourth Amendment rights were violated by the challenged search or seizure. *United States v. Padilla,* — U.S. —, —, 113 S.Ct. 1936, 1939, 123 L.Ed.2d 635 (1993); *Alderman v. United States,* 394 U.S. 165, 171–72, 89 S.Ct. 961, 965–66, 22 L.Ed.2d 176 (1969). Fourth Amendment rights are personal and cannot be vicariously asserted. *United States v. Payner,* 447 U.S. 727, 731, 100 S.Ct. 2439, 2444, 65 L.Ed.2d 468 (1980). As an initial matter, then, it is apparent that Richard failed to produce evidence at the suppression hearing tending to support his burden in this respect. Unit 606 was rented in William's name, and Gail Harris, the rental manager of the condominiums, testified that Richard's name did not appear on any other documents, nor had she ever seen or known anything about Richard. Furthermore, William testified briefly that the briefcase belonged to *him* (William). While "arcane" concepts of property law do not control an individual's ability to claim Fourth Amendment protection, *Rakas v. Illinois,* 439 U.S. 128, 143, 99 S.Ct. 421, 430, 58 L.Ed.2d 387 (1979), ownership is a factor which may be considered, *Rawlings,* 448 U.S. at 105, 100 S.Ct. at 2561. Richard simply failed to establish any expectation of privacy in the briefcase, and the district court's finding of abandonment as to Richard was superfluous.

The government argues that any conceivable expectation of privacy manifested by William was abandoned by virtue of his failure to timely check out of Unit 606. As noted above, the district court emphasized that this was a "very definite limited tenancy." However, William's characterization of the tenancy as a "five-month rental arrangement," Br. at 20, is not entirely inaccurate. While William's contract for Unit 606 was only for two months, William initially had signed a five-month agreement for Unit 408. That Meyer, in the middle of *that* tenancy, relocated William to Unit 606 does not mean that William's expectation of privacy from the full five-month lease was summarily truncated. For example, had William been relocated on the 29th day of the fifth month—and thus lived in Unit 606 for only one day—he would still possess a far greater expectation of privacy than a individual who appeared at Back Bay that same day asking for a one-night rental (if Meyer even let its condominiums on that basis).

■ In any event, we do not read the district court's statement as suggesting that William at no time possessed a legitimate expectation of privacy in Unit 606. As noted above, a multi-month condominium rental certainly confers on the lessee a greater interest in the rented premises than would a nightly hotel reservation. And it is well-settled that a person does not forfeit Fourth Amendment protection merely because he is residing in a hotel room. *See, e.g., Hoffa v. United States,* 385 U.S. 293, 301, 87 S.Ct. 408, 413, 17 L.Ed.2d 374 (1966); *United States v. Newbern,* 731 F.2d 744, 748 (11th Cir.1984); *United States v. Bulman,* 667 F.2d 1374, 1383 (11th Cir.), *cert. denied sub nom. Howard v. United States,* 456 U.S. 1010, 102 S.Ct. 2305, 73 L.Ed.2d 1307 (1982). Use of a motel room for lodging provides the same expectation of privacy as does a home. *United States v. Roper,* 681 F.2d 1354, 1357 n. 1 (11th Cir.1982), *cert. denied sub nom. Newton v. United States,* 459 U.S. 1207, 103 S.Ct. 1197, 75 L.Ed.2d 440 (1983). *See also Katz v. United States,* 389 U.S. 347, 351, 88 S.Ct. 507, 511, 19 L.Ed.2d 576 (1967) ("Fourth Amendment protects people, not places").

Thus, while William's tenancy may have been more "limited" than, for example, a full ownership in a condominium or even a year-long apartment rental, it was not outside

Fourth Amendment protection. The question, simply, is whether William relinquished his interest in Unit 606 (and his property therein) so that he could no longer retain a reasonable expectation of property in it *at the time of Trooper Stewart's search*. *Winchester*, 916 F.2d at 603.

■ In *United States v. Savage*, 564 F.2d 728 (5th Cir.1977), upon which the government relies, agents seized counterfeit notes and other incriminating evidence from a suitcase found in the defendant's motel room at 12:00 P.M., one hour after the motel's 11:00 A.M. check-out time. The court concluded that the defendant automatically relinquished possession of the room at 11:00 A.M. and, furthermore, he had turned in his key the night before. *Id.* at 733 and 730 n. 5. More evidence than mere possession of a key is necessary to satisfy a claimant's burden of establishing a legitimate expectation of privacy. *See United States v. Rackley*, 742 F.2d 1266, 1270 (11th Cir.1984). *But see Newbern*, 731 F.2d at 748 (defendants had "complete control" over hotel room because no other persons possessed keys to room). Yet *Savage*, while binding on this Court[1], is distinguishable from the instant case for several reasons.

■ The defendant there was lodging in a motel, and his length of stay is not ascertainable from the facts stated in the opinion. Moreover, he turned in his key the evening before the search and seizure, unmistakably evincing an intention to vacate the motel room at or before the next check-out time. William Ramos, on the other hand, initially signed a *five-month written* rental agreement, subsequently converted to a two-month agreement. Each agreement was for a *specific* condominium. Furthermore, William did not turn in his key to Meyer the day before the briefcase was seized. William's contacts with the place of the search and seizure—Unit 606—were far more "regular or personal," *United States v. Garcia,* 741 F.2d 363, 366 (11th Cir.1984), than were those of the defendant in *Savage*.

The cleaners sent by Meyer certainly had a right to be in William's unit after the check-out time. Meyer personnel themselves had such a right, also. William's counsel conceded at the suppression hearing that even Trooper Stewart had a right to be inside Unit 606 at that time. But the drugs seized by Stewart were located in a *locked briefcase*, and given the "words, acts and other objective facts" surrounding the seizure, *Pirolli*, 673 F.2d at 1204, the district court erroneously concluded that William had abandoned his expectation of privacy in the briefcase.

Another panel of this Court has described the relevance and unique nature of a briefcase as follows:

A briefcase is often the repository for more than business documents. Rather, it is the extension of one's own clothing because it serves as a larger "pocket" in which such items as wallets and credit cards, address books, personal calendar/diaries, correspondence, and reading glasses often are carried. *Few places outside one's home justify a greater expectation of privacy than does the briefcase.*

*Freire*, 710 F.2d at 1519 (emphasis supplied). Nonetheless, as with other property subject to Fourth Amendment protection, a briefcase can be abandoned, causing a forfeiture of such rights.

In *Lehder–Rivas*, one defendant left a locked suitcase with a slight acquaintance, promising to retrieve it within three months. After a year passed, two men showed up to retrieve the suitcase, but the acquaintance would not release it absent the defendant's permission. Two months later, the acquaintance turned the suitcase over to the police. The defendant clearly had abandoned the suitcase and, therefore, lacked standing to contest its search. *Lehder–Rivas*, 955 F.2d at 1522. In another case, where the defendant's briefcase was discovered in a pile of trash three days after having been stolen, the defendant no longer had an expectation of privacy in the briefcase. *United States v. O'Bryant*, 775 F.2d 1528, 1534 (11th Cir. 1985). Following an airport arrest, where a

---

**1.** In *Bonner v. City of Prichard*, 661 F.2d 1206, 1207 (11th Cir.1981) (en banc), this Court adopted as precedent decisions of the former Fifth Circuit rendered prior to October 1, 1981.

defendant repeatedly disclaimed ownership of a codefendant's carry-on luggage and disassociated himself with the codefendant, the defendant abandoned any privacy interest he may have possessed in the bag prior to the arrest. *McKennon,* 814 F.2d at 1546.

Of course, property other than a briefcase or suitcase is equally subject to abandonment, under the same fact-based intent analysis. In *Winchester,* a defendant drove past a series of marked police cars and two-dozen officers stationed outside the cottage he had just departed, then called a deputy marshal the next day and, after identifying himself as the defendant, asked, "How do you like that Glock?" This court concluded that the district court was not clearly erroneous in finding that the defendant abandoned not only the cottage, but also the property contained within it, including the seized firearm. *Winchester,* 916 F.2d at 604. Where a defendant told a girlfriend with whom he was sharing a Miami apartment that he was leaving for Houston and not coming back, the defendant was deemed to have abandoned clothing subsequently seized from the Miami apartment. *United States v. DeParias,* 805 F.2d 1447, 1458 (11th Cir.1986), *cert. denied sub nom. Ramirez v. United States,* 482 U.S. 916, 107 S.Ct. 3189, 96 L.Ed.2d 678 (1987). But when, during a *Terry* stop,[2] a suspect attempted to protect from inspection a bag he was carrying by throwing it on the hood of his car, that individual "clearly has not abandoned that property." *Smith v. Ohio,* 494 U.S. 541, 544, 110 S.Ct. 1288, 1290, 108 L.Ed.2d 464 (1990).

"Fourth Amendment search and seizure law is fraught with uncertainties and difficult distinctions." *United States v. Bosby,* 675 F.2d 1174, 1180 (11th Cir.1982). Nearly every case in this area of the law has some feature distinguishable from the next. Determining whether an abandonment has occurred requires a consideration of case-specific facts, and, in the instant appeal, the nature of William Ramos' tenancy in Unit 606 is of particular significance. A rental of a condominium owned by another, through the owner's supervising agent, necessarily confers on the lessee a lower expectation of privacy than that possessed by the owner. Nevertheless, we are not persuaded that an individual who overstays a two-month condominium rental by a few hours forfeits his privacy rights in a locked briefcase found inside the unit.

Initially, William had a five-month lease for Unit 408. The check-out time for all of the units managed by Meyer was 10:00 A.M. When he was re-assigned to Unit 606 on November 1, 1991, cleaners from D.J.'s helped to move his belongings to the new unit. It is not clear from the record whether, on November 1, 1991, William was late in moving out of Unit 408. However, Debbie Anding testified that often "people don't get out right at 10." Three different witnesses stated that when this would occur, the procedure was to pack the personal belongings and *hold* them until the owner of the items—the departing lessee—could be located. It was not unreasonable for William to assume that the cleaners, having previously moved some of his possessions *to* Unit 606, would pack and store these items if he were late *departing* that unit, even if William had *timely* vacated Unit 408.

The government states that William, having been the tenant of record on two different Meyer leases, each providing for a 10:00 A.M. check-out, was "well aware of the checkout time and the implications of missing that deadline." Br. at 21. As conceded by the government at oral argument, however, other than stating that this time would be "strictly enforced," the rental agreement was entirely silent as to what these implications might be. We suspect that the likely implications would be loss of a dwelling place and the incurring of partial or full liability for the next period's rent.

However, considering that the date in question here was New Year's Day, it is quite possible that an individual might "hold over" not intending to abandon everything that was contained within the leased premises. Thus, the loss of a reasonable expectation of privacy in a locked briefcase placed

---

**2.** *See Terry v. Ohio,* 392 U.S. 1, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968) (permitting brief detention of

person and/or property on the basis of only "reasonable, articulable suspicion")

beneath a bed is neither an implication nor legal consequence of a four-hour overstay on New Year's Day in a condominium that has been occupied for the previous eight weeks. Based on the surrounding circumstances, including the fact that William telephoned the Meyer office the following day, we conclude that William did not abandon his reasonable expectation of privacy in the briefcase. To this extent, we hold only that he had standing to contest the search conducted by Trooper Stewart, the legality of which the district court never considered.

The district court did not err in denying Appellants' motion to suppress testimony and physical evidence derived from the Texas search. Additionally, the district court did not err in refusing to allow Richard Ramos to withdraw his guilty plea. We find no merit with respect to those arguments. The district court's finding that Richard Ramos abandoned the briefcase was superfluous, because Richard never established that he had a legitimate expectation of privacy that he could abandon.

## IV. CONCLUSION

Accordingly, the judgment with respect to Richard Ramos is AFFIRMED.

Because of its erroneous finding that William Ramos abandoned his expectation of privacy in the briefcase, the district court did not reach the other issues concerning the legality of the Alabama search. Those issues should not be addressed for the first time on appeal. Accordingly, we VACATE the judgment as to William Ramos and REMAND the case to the district court so that it may address the remaining issues related to William Ramos' motion to suppress the fruits of the Alabama search.