[PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT

_____

No. 18-11679

_____

D.C. Docket No. 3:17-cr-00086-MCR-1

UNITED STATES OF AMERICA,

Plaintiff - Appellee,

versus

WALI EBBIN RASHEE ROSS,
a.k.a. Wali Ibn Ross,
a.k.a. Wal Ebbin Rashee Ross,

Defendant - Appellant.

_____

Appeal from the United States District Court
for the Northern District of Florida

_____

(October 29, 2019)

Before WILSON and NEWSOM, Circuit Judges, and PROCTOR,[*] District Judge.

NEWSOM, Circuit Judge:

This appeal arises out of the denial of a defendant's motion to suppress evidence found in two separate, warrantless searches of his motel room—the first turned up a gun; the second, drugs and associated paraphernalia.  On appeal, the defendant, Wali Ross, challenges the constitutionality of both searches.  The government responds by defending the searches on the merits and, as a threshold matter, by disputing Ross's Fourth Amendment "standing" to contest them.  (For the uninitiated, Fourth Amendment "standing" really has nothing to do with true-blue standing; rather, it constitutes a threshold element of a defendant's constitutional challenge on the merits.  More on that later.)  With respect to the standing issue, the government first argues that Ross "abandoned" his room, and any privacy interest therein, when, after seeing police officers staked out in the parking lot, he fled the motel on foot.  Accordingly, the government says, Ross lacks Fourth Amendment standing to challenge either of the two subsequent searches.  Moreover, and in any event, the government contends that any reasonable expectation of privacy that Ross might have had in the room expired at

---

[*] Honorable R. David Proctor, United States District Judge for the Northern District of Alabama, sitting by designation.

the motel's standard 11:00 a.m. checkout time, and that he therefore lacks standing, at the very least, to challenge the second of the two searches.

We hold as follows:  In the circumstances of this case, Ross did not abandon his room when he ran, and he therefore has Fourth Amendment standing to challenge the officers' initial entry and the ensuing protective sweep, which they conducted within about 10 minutes of his flight.  We further hold, however, that Ross's constitutional challenge to the officers' entry and sweep fails on the merits. As to the second search, which officers carried out with the consent of hotel management shortly after 11:00 a.m., we hold that Ross lost any reasonable expectation of privacy in his room at checkout time—and with it, his Fourth Amendment standing to contest the search.

# I

## A

The following took place between [approximately] 8:00 a.m. and 12:00 p.m. on July 21, 2017.

Early that morning, a joint state-federal task force gathered outside a Pensacola motel to arrest Wali Ross on three outstanding felony warrants—for trafficking hydrocodone, failure to appear on a battery charge, and failure to appear on a controlled-substances charge.  Although the officers had information that Ross was staying at the motel, he wasn't a registered guest, so they set up

3

surveillance around the building and waited for him to make an appearance. The officers knew that Ross was a fugitive who had a history of violence and drug crimes.

Sometime between 9:00 and 9:30 a.m., Special Agent Jeremy England saw Ross leave Room 113, head for a truck, return to his room briefly, and then approach the truck again. When Ross spotted the officers, he made a break for it, scaling a chain-link fence and running toward the adjacent Interstate 10. The officers went after Ross, but when they reached the opposite side of the interstate to intercept him, he wasn't there. In the meantime, it dawned on Agent England that none of the officers had stayed behind at the motel, and he feared that Ross might have doubled back to the room unnoticed. So, about ten minutes after the chase began, Agent England and Detective William Wheeler returned to the motel to see if Ross had snuck back into his room. The door to Room 113 was closed, and Ross's truck remained in the parking lot.

Detective Wheeler obtained a room key and a copy of the room's registration from the front desk—the latter showed that the room was rented for one night to a woman named Donicia Wilson. (Although the name meant nothing to the officers at the time, they later learned that Ross was "a friend of a friend" of Wilson's husband; she had rented the room after she and her husband refused Ross's request to spend the night at their home because they had children and

didn't know him very well.)  Using the key, Agent England and Detective Wheeler

entered Room 113 to execute the warrants and arrest Ross; they entered without

knocking, as they believed that someone inside—Ross, a third party, or both—

might pose a threat to them.  Agent England testified that because Ross had a

history of violence it was "just protocol" to operate on the premise that there would

"possibly [be] someone [in the motel room] to hurt" them—in light of that risk, he

said, the officers "made a tactical entry into the room."  Once inside, they

conducted a quick protective sweep, and on their way out Agent England saw in

plain view a grocery bag in which the outline of a firearm was clearly visible.

Agent England seized the gun, touched nothing else, and left.

Deputy U.S. Marshal Nicole Dugan notified ATF about the gun while Agent

England and Detective Wheeler continued to surveil the motel.  ATF Special

Agent Kimberly Suhi arrived at the motel around 10:45 a.m. to retrieve the

firearm.  The motel's manager, Karen Nelson, told Agent Suhi that she could

search Room 113 after the motel's standard 11:00 a.m. checkout time; up until that

point, Suhi testified, Nelson "st[ood] in the doorway of the room" to "mak[e] sure

no one was entering."[1]  Nelson explained that if it looked like a guest was still

using his room at checkout time, she might place a courtesy call to ask if he wanted

---

[1] Nelson testified that she had arrived at work after Ross fled from police, that she hadn't seen anyone enter the room, and that she had no knowledge of the officers' earlier entry and sweep.

to stay longer; otherwise, she said, motel management assumed that every guest had departed by 11:00 a.m., at which point housekeepers would enter the room to clean it. Nelson also explained that it was the motel's policy to inventory and store any items that guests left in their rooms and to notify law enforcement if they found any weapons or contraband.

At 11:00 a.m., Agent Suhi again sought and received Nelson's permission to search Room 113. When ATF agents entered the room, they found a cell phone and a Crown Royal bag filled with packets of different controlled substances— including around 12 grams of a heroin-laced mixture—cigars, and a digital scale.

## B

Ross was charged with one count of being a felon in possession of a firearm and ammunition, one count of knowingly possessing heroin with intent to distribute, one count of firearms-related forfeiture, and one count of forfeiture related to the property and proceeds obtained by a controlled-substances violation. He moved to suppress the evidence found in both searches of his motel room. In his motion, Ross argued that the officers' initial entry—and the ensuing protective sweep, which turned up the gun—violated the Fourth Amendment "because there were no grounds for them to believe that a dangerous individual (or anyone) was inside the room." He asserted that "it would have been unrealistic for the officers to believe that [he] had returned to the room and was inside at that time (after

6

fleeing from them)." Accordingly, he said, the officers didn't have the requisite reasonable belief either to enter the room or to conduct the sweep. Ross also argued that the second search—which was conducted with Nelson's permission just after 11:00 a.m., and in which the drugs were discovered—violated the Fourth Amendment "regardless of the alleged consent of the hotel management because it would not have occurred absent the illegal first search." According to Ross, "[t]he illegal seizure of the firearm . . . directly [led] to the agents' desire to conduct the second search and their discussion with management to try to get its consent."

With respect to the initial entry and the protective sweep, the government responded (1) that because the officers couldn't find Ross near the interstate, they had reason to believe that he had returned to his motel room; (2) that Ross's multiple drug- and violence-related felony arrest warrants led the officers to conclude that he could be armed and dangerous; and (3) in addition, that exigent circumstances justified the entry, as "there was a definite likelihood that further delay could cause the escape of the defendant" and "jeopardize the safety of the officers and the public." With respect to the second search, the government argued that Ross didn't have Fourth Amendment "standing" to challenge it, as he had no reasonable expectation of privacy in Room 113 after the 11:00 a.m. checkout time and that, in any event, the search was valid because the officers reasonably believed that Nelson had the authority to consent to the search. Finally, the

government contended that even if the second search was tainted, motel staff would inevitably have entered the room after checkout time and alerted police when they found the gun in plain view.

The district court denied Ross's motion to suppress. With respect to the initial entry and sweep, the court found that "[t]he arrest warrant granted officers a limited ability to enter to effectuate the arrest on [their] reasonable belief that Ross was in the room." Moreover, the court observed, the fact that Room 113 was not registered in Ross's name gave the officers "reason to be concerned that someone else might be in the room as well." Finally, the court held that "the chase and the fact that the officers lost sight of Ross presented exigent circumstances" that further justified the sweep—because the officers were in hot pursuit of a suspect with a history of violent activity for whom they had an arrest warrant, and who reasonably could have returned to the room, the first search was lawful.

With respect to the second search, the district court concluded that after checkout time, Ross—who hadn't requested a late checkout or paid for an additional day—had no protectible privacy interest in the room. The court separately held that even if the initial entry and sweep were unlawful, Nelson's consent provided ample authority for the officers' post-checkout search. Finally, the court found that the inevitable-discovery and independent-source doctrines applied—either motel employees would have found the incriminating evidence

8

when cleaning Room 113 after checkout time, or the task-force officers would have eventually searched the room.

Ross pleaded guilty to possession of a firearm and ammunition by a convicted felon and possession with intent to distribute heroin, reserving the right to appeal the denial of his motion to suppress.[2]

## II

The Fourth Amendment guarantees "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures."  U.S. Const. amend. IV.  As already explained, this case involves two separate searches of Ross's motel room.  We will consider them in turn.

## A

Ross first challenges the officers' initial entry and the ensuing protective sweep, which they conducted roughly 10 minutes after Ross fled the motel on foot and shortly after they lost sight of him during the chase.  The government not only defends the entry and sweep on the merits but also contends that Ross "abandoned" his motel room when he ran and, therefore, that he lacks Fourth Amendment

---

[2] "A ruling on a motion to suppress presents a mixed question of law and fact.  We review the district court's findings of fact for clear error and its legal conclusions *de novo*." *United States v. Johnson*, 777 F.3d 1270, 1273–74 (11th Cir. 2015) (quotation omitted).  "All facts are construed in the light most favorable to the party prevailing below"—here, the government. *Id.* at 1274 (quotation omitted).

"standing" to complain.  Because standing presents a threshold question, we will address it first and then turn—if and as necessary—to the merits.

**1**

The Fourth Amendment's protections extend to any thing or place with respect to which a person has a "reasonable expectation of privacy," *California v. Ciraolo*, 476 U.S. 207, 211 (1986) (quotation omitted)—including a hotel room, *see, e.g.*, *Stoner v. California*, 376 U.S. 483, 490 (1964).  By contrast, an individual's Fourth Amendment rights are *not* infringed—or even implicated—by a search of a thing or place in which he has no reasonable expectation of privacy. *See, e.g.*, *United States v. Brazel*, 102 F.3d 1120, 1147 (11th Cir. 1997).  This threshold issue—whether an individual has a reasonable expectation of privacy in the object of the challenged search—has come to be known as Fourth Amendment "standing."  To be clear—stay tuned for additional detail—Fourth Amendment "standing" and traditional Article III standing are *not* the same thing.

The government argues here that Ross "abandoned" any reasonable expectation of privacy in his room when he fled the motel with no intention of returning.  Accordingly, the government says, Ross lacks Fourth Amendment standing to challenge either the initial entry and the ensuing protective sweep— which occurred after the officers' ill-fated pursuit of Ross toward I-10, and in

10

which they discovered the gun—or the subsequent search—which occurred shortly after 11:00 a.m., and in which officers discovered the drug-related evidence.[3]

Although it's a close call, we reject the government's abandonment argument. We hold, therefore, that Ross has standing—at least to challenge the officers' initial entry and sweep. (As explained below, we conclude for other reasons that Ross lacks standing to challenge the officers' second, post-checkout search. *See infra* at 20–25.)

**a**

Before addressing the substance of the government's position regarding abandonment, we first have to deal with a threshold procedural issue—namely, that the government didn't argue abandonment in the district court. Accordingly, we must determine whether the government has waived its Fourth Amendment standing objection—abandoned its abandonment argument, so to speak—vis-à-vis the initial entry and sweep.

As a general matter, we have held that if the government fails to contest Fourth Amendment standing before the district court, it waives the issue for appellate purposes. *See United States v. Gonzalez*, 71 F.3d 819, 827 n.18 (11th

---

[3] In a footnote in its brief, the government seems to suggest, separately, that because Ross's name wasn't on the hotel registration, he never "established a legitimate expectation of privacy in Room 113 such that he had standing to contest either search [even] absent any abandonment." It's an interesting question—whether an individual who stays alone overnight in a hotel room rented by someone else has a protectible privacy interest in that room. But because the parties didn't brief that issue, and it wasn't raised before the district court, we won't address it here.

11

Cir. 1996), *abrogated on other grounds by Arizona v. Gant*, 556 U.S. 332 (2009); *United States v. Kapperman*, 764 F.2d 786, 791 n.6 (11th Cir. 1985).  The government contends, though, that a different rule applies here under our decision in *United States v. Sparks*, 806 F.3d 1323 (11th Cir. 2015).  *Sparks*, the government correctly says, holds that where a defendant has abandoned a premises, he suffers no injury from a search of it—and therefore has no standing in *either* the Fourth Amendment sense *or* the Article III sense.  *Id.* at 1341 n.15.  And, the argument goes, because abandonment implicates Article III standing—and thus subject matter jurisdiction—the issue isn't waivable.  *Id.*

We have misgivings about the correctness of *Sparks*, which seems to "confuse[]" Fourth Amendment and Article III standing in precisely the way that the Supreme Court has forbidden.  *See Byrd v. United States*, 138 S. Ct. 1518, 1530 (2018) ("The concept of standing in Fourth Amendment cases can be a useful shorthand for capturing the idea that a person must have a cognizable Fourth Amendment interest in the place searched before seeking relief for an unconstitutional search; but it should not be confused with Article III standing, which is jurisdictional and must be assessed before reaching the merits.").  Even so, we recognize that we are bound by *Sparks*'s holding that where, as here, the challenge to Fourth Amendment standing results from a defendant's alleged act of abandonment, the challenge likewise implicates Article III jurisdiction, rendering it

12

non-waivable. *See, e.g.*, *Breslow v. Wells Fargo Bank*, 755 F.3d 1265, 1267 (11th Cir. 2014) ("[I]t is the firmly established rule of this Circuit that each succeeding panel is bound by the holding of the first panel to address an issue of law, unless and until that holding is overruled en banc, or by the Supreme Court.") (alteration in original) (quotation omitted). Rightly or wrongly, therefore, we find ourselves constrained to agree with the government that its failure to contest Ross's standing to challenge the officers' initial entry and sweep in the district court doesn't bar it from doing so here.

We turn, then, to address the government's abandonment argument on the merits.

**b**

"[I]t is settled law that one has no standing to complain of a search or seizure of property he has voluntarily abandoned." *United States v. Colbert*, 474 F.2d 174, 176 (5th Cir. 1973) (en banc) (citations omitted).[4] While a defendant bears the initial burden of demonstrating that he has a reasonable expectation of privacy in a place or thing, the government bears the burden of proving that he has abandoned the property and, with it, his expectation of privacy. *See United States v. Ramos*, 12 F.3d 1019, 1023 (11th Cir. 1994).

---

[4] *See Bonner v. City of Prichard*, 661 F.2d 1206, 1209 (11th Cir. 1981) (adopting pre-October 1981 Fifth Circuit case law as binding precedent).

13

The "critical inquiry" for present purposes is whether Ross "voluntarily discarded, left behind, or otherwise relinquished his interest in [his motel room] so that he could no longer retain a reasonable expectation of privacy with regard to it at the time of the search." *Id.* at 1022 (emphasis omitted) (quoting *United States v. Winchester*, 916 F.2d 601, 603 (11th Cir. 1990)). His intent "may be inferred from acts, words and 'other objective facts.'" *Id.* at 1023 (quoting *United States v. Pirolli*, 673 F.2d 1200, 1204 (11th Cir. 1982)). In assessing abandonment, we consider "[a]ll relevant circumstances existing at the time of the alleged abandonment," *Colbert*, 474 F.2d at 176 (citation omitted), as well as subsequent events, which may provide "evidence of the defendant's intent to abandon the property at the previous time," *Winchester*, 916 F.2d at 604 (citation omitted). Abandonment under the Fourth Amendment "is not abandonment in the 'strict property-right sense'" but rather is evaluated using a "common sen[s]e approach." *Sparks*, 806 F.3d at 1342 (alteration in original) (quoting *United States v. Edwards*, 441 F.2d 749, 753 (5th Cir. 1971)).

The abandonment issue here is close; we can see both sides. For the reasons explained below, however, we conclude that the government has not discharged its burden of demonstrating that Ross had abandoned his room at the time of the officers' initial entry and protective sweep—which, again, occurred no more than 10 minutes after Ross fled the motel.

14

The facts pertaining to Ross's alleged abandonment are not well developed—in large part because, as already noted, the government didn't argue abandonment in the district court. And indeed, on appeal, the government doesn't really make much of a *factual* argument regarding Ross's abandonment, aside from asserting that Ross never returned to Room 113 or sought to extend his stay. Instead, the government relies primarily on statements in Ross's opening brief. There, Ross said, for instance, that "it was objectively unreasonable to think that [he] would have returned to the room"—and, indeed, that "[t]he premise that [he] would have returned to the room was absurd." Br. of Appellant at 26. In fairness, though, Ross made those statements in an effort to rebut the government's merits-based argument, in support of the initial entry's constitutionality, that the officers had good reason to believe that Ross was in Room 113—an argument that tends (rather conspicuously) to undermine its contention that Ross had abandoned the very same room.[5] In his reply brief, Ross hastened to clarify that "[t]he government [was] confus[ing his] lack of intent to return to Room 113 *while police*

---

[5] Indeed, both parties are trying to have it both ways—Ross argues with respect to the merits of the initial entry and sweep that the officers had no reason to believe that he would have gone back to the room, while asserting with respect to abandonment that his flight didn't reflect an intention not to return. For its part, the government simultaneously contends that the officers reasonably thought that Ross was in the room—and accordingly were justified in entering to arrest him and in conducting a protective sweep—and that it was inconceivable that Ross would have returned. Inconsistency all around.

*officers [we]re present* with an abandonment of the property contained within the room." Reply Br. of Appellant at 7.

To be clear, we have held that an individual *can* abandon a reasonable expectation of privacy solely as a result of police pursuit or presence. In *United States v. Edwards*, a defendant involved in a high-speed chase that ended in a car crash exited his vehicle—ditching it on a public highway, leaving the engine and lights on—and fled from police on foot. 441 F.2d 749, 750 (5th Cir. 1971). After unsuccessfully pursuing the defendant, officers returned to the car to inspect it, where they found illegal whiskey in the trunk. *Id.* The defendant moved to suppress the whiskey, arguing that he had a reasonable expectation of privacy in the car's trunk. *Id.* at 749. We held that even if the defendant might initially have had a protectible privacy interest in his car, he had abandoned it by running away. *Id.* at 751.

There are obvious similarities between *Edwards* and this case—like the defendant there, Ross saw the police, bolted, and left his belongings in order to avoid arrest. We conclude, though, that there are also important differences. Two, in particular, convince us that the government hasn't carried its burden of demonstrating Ross's abandonment.

First, the object of the search at issue here was a hotel room, not a car. Cars have historically been accorded a reduced level of Fourth Amendment protection.

16

*See, e.g.*, *California v. Acevedo*, 500 U.S. 565, 569–70 (1991); *United States v. Holland*, 740 F.2d 878, 879–80 (11th Cir. 1984) (explaining that there is "a diminished expectation of privacy in automobiles" and that their "inherent mobility" distinguishes them from homes).  By contrast, while a hotel room is not exactly a "house[]" within the meaning of the Fourth Amendment—one needn't ever "check out" of his own residence, for instance—the courts have long held that hotel rooms are entitled to a home-like level of constitutional protection.  *See Stoner*, 376 U.S. at 490 ("No less than a tenant of a house, or the occupant of a room in a boarding house, a guest in a hotel room is entitled to constitutional protection against unreasonable searches and seizures.") (citation omitted); *see also United States v. Forker*, 928 F.2d 365, 370 (11th Cir. 1991) (stating that a person's hotel room is the "equivalent" of his home).

Second, there are meaningful factual distinctions between *Edwards* and this case.  The defendant there left his car in the middle of a public highway, with the keys in the ignition and the lights on, before running from the police.  441 F.2d at 750.  When Ross fled the motel, by contrast, he locked his room and kept his key with him.  Especially given that only 10 minutes elapsed between Ross's flight and the officers' warrantless entry, we simply can't say that, by that time, Ross had abandoned his privacy interest in the room.

17

We hold, therefore, that Ross has the requisite standing to challenge the officers' initial entry and protective sweep on the merits.

**2**

That, for Ross, is the good news. The bad: We hold that the task-force officers' initial entry and accompanying protective sweep of Ross's room complied with the Fourth Amendment.

As already explained, when the officers arrived at the motel on the morning of July 21, 2017, their objective was to arrest Ross on several outstanding warrants. "[F]or Fourth Amendment purposes, an arrest warrant founded on probable cause implicitly carries with it the limited authority to enter a dwelling in which the suspect lives when there is a reason to believe the suspect is within." *United States v. Williams*, 871 F.3d 1197, 1201 (11th Cir. 2017) (alteration in original) (quotation omitted). We can assume for present purposes that a person's hotel room counts as a "dwelling," *see Forker*, 928 F.2d at 370, and, therefore, that the rules we have articulated for in-home arrests pursuant to valid warrants apply here, as well.

In particular, in order to enter a hotel room to execute an arrest warrant, a law enforcement officer "must have a reasonable belief" both (1) that the room is in fact the suspect's and (2) that the suspect is inside. *See Williams*, 871 F.3d at 1201. "In undertaking this two-part inquiry, we consider the totality of the

18

circumstances known to the officer at the time the warrant is executed and are guided by 'common sense factors.'" *Id.* (quotations omitted). Officers need not be "absolutely certain" that a suspect is inside before entering "to execute an arrest warrant." *United States v. Magluta*, 44 F.3d 1530, 1538 (11th Cir. 1995). Rather, they "may make reasonable inferences and presumptions based on the time of day or observations at the scene"—for instance, "that a person is [there] when his vehicle is parked outside." *Williams*, 871 F.3d at 1201. If, based on such rational deductions, the officers have a reasonable belief that a suspect is inside, they may search for him "until [he] is found." *Id.* Moreover, in order "[t]o protect their safety while making, and after, an arrest, [the] officers may also perform a 'protective sweep'" of the premises. *Id.* (quotation omitted). And finally, while inside, the officers "are permitted to seize any contraband in plain view." *Id.*

Here, the officers clearly knew that Ross was staying in Room 113—they had watched him walk out the door, approach a truck in the parking lot, return to the room, and then reemerge. The facts also support the conclusion that the officers had the requisite "reasonable belief"—based on "common sense factors" and permissible "inferences and presumptions"—that Ross had returned to the room following his flight toward I-10. The officers knew, for instance, not only that Ross had been in Room 113 but also that he had left his truck in the motel's parking lot. They also knew that after chasing Ross, they had lost sight of him and

19

that no one had thought to stay behind to surveil the motel. Finally, they knew that when they returned, Ross's truck was still in the motel's parking lot, eliminating the possibility that he had driven away and (on balance) increasing the probability that he was back inside the room. Particularly given that the officers' ill-fated pursuit of Ross had lasted no more than 10 minutes, we think it was eminently reasonable for them to conclude that Ross had doubled back to the motel and taken refuge in his room.

Because the officers reasonably believed that Ross was in Room 113, they had authority (1) to enter the room to execute the arrest warrants, (2) to conduct a limited protective sweep of the room to ensure that no one inside posed a danger to them,[6] and (3) to seize the gun, which they found in plain view. *See Williams*, 871 F.3d at 1201. The officers' entry, sweep and seizure, therefore, complied with the Fourth Amendment. We affirm the district court's denial of Ross's motion to suppress the gun.

**B**

We turn, then, to the second search, which the officers conducted with motel management's consent shortly after 11:00 a.m. and in which they discovered drug-

---

[6] Recall that before they entered, the officers knew that Room 113 was rented in someone else's name, which increased the risk that a second person, in addition to Ross, might also be inside. *Cf. United States v. Standridge*, 810 F.2d 1034, 1037 n.2 (11th Cir. 1987) (holding that a protective sweep of a hotel room was permissible where "the police had not followed [the defendant] when he went to the motel and the room had not been constantly watched," and "thus, the police could not know whether [the defendant] was alone").

20

related evidence. Once again, we begin—and this time find that we can end—with the government's contention that Ross lacks Fourth Amendment standing. The government's standing argument concerning the second search—which it clearly made, and thus preserved, in the district court—is slightly different from its argument concerning the initial entry. With regard to the second search, the government contends that Ross's reasonable expectation of privacy in his motel room expired—lapsed—as of the motel's standard 11:00 a.m. checkout time. For the reasons that follow, we agree.

While our existing precedent provides a few hints, it doesn't squarely answer what we'll call the "checkout time" question. In *United States v. Savage*, for instance, we stated in a footnote that the defendant there had "automatically relinquished possession of [his room] . . . at 11 a.m., the motel's checkout time." 564 F.2d 728, 730 n.5 (5th Cir. 1977). In that case, though, the defendant "had turned in his key the night before," thereby clearly evidencing an affirmative intent to quit the room. *Id.* In a later decision, *United States v. Ramos*, we clarified that "[m]ore evidence than mere possession of a key" after checkout time "is necessary to satisfy a claimant's burden of establishing a legitimate expectation of privacy." 12 F.3d at 1024 (citation omitted). There, we concluded that because the defendant had a two-month rental agreement for a specific condominium unit and still had a key to the unit when the lease expired, he had a "far more 'regular or

21

personal'" connection to the premises than a short-term hotel guest like the one in *Savage*. *Id.* As a result, we held that the defendant retained an expectation of privacy in a locked briefcase that he had failed to remove from the condo before the mandatory moveout time. *Id.* at 1025–26.

Neither *Savage* nor *Ramos* is precisely on point here. Like the defendant in *Ramos*—and unlike the defendant in *Savage*—Ross apparently kept the key to his room beyond the motel's standard 11:00 a.m. checkout time. (There's certainly no evidence that he returned it early.) But *Ramos* teaches that one's post-checkout possession of a room key isn't conclusive, and its holding, in any event, ultimately concerned only the defendant's expectation of privacy in a locked briefcase left in a room—not the room itself.[7] Moreover, unlike the defendant in *Ramos*, Ross had no long-term interest in Room 113. Quite the contrary, in fact; like the defendant in *Savage*, Ross was an overnight guest in an ordinary motel room—and even further attenuating Ross's interest, "his" room was rented in someone else's name. Accordingly, Ross's connection to Room 113 was not remotely (in the words of *Ramos*) "regular or personal."

---

[7] We note that Ross argues here only that he retained an expectation of privacy in Room 113 itself; he does not assert a separate privacy interest in any closed containers inside the room— say, for instance, the Crown Royal bag full of drugs. That might—or might not, we needn't decide—have presented a different issue. *Cf. United States v. Owens*, 782 F.2d 146, 150 (10th Cir. 1986) (holding that even if an individual "did not retain a protected privacy interest in his [motel] room" after checkout time, "it certainly would have been reasonable for him to expect that the contents of closed containers he kept in his room would not be exposed to scrutiny by the police or motel personnel").

We hold, with one minor caveat explained below, that a short-term hotel guest like Ross has no reasonable expectation of privacy in his room after checkout time, and thus no standing to object to a room search that police conduct with the consent of hotel management after checkout time has passed. What, one might ask, is the magic of checkout time? After all, even before then, during a hotel guest's tenure, hotel employees may enter the guest's room—say, to make the bed or restock toiletries. It's about control. Those sorts of fleeting, pre-checkout entries don't fundamentally compromise a guest's reasonable expectation of privacy in his room because as long as the guest is lawfully in the room, he has at least a qualified right to exclude others, including hotel staff—*see, e.g.*, the "DO NOT DISTURB" doorhanger. Unsurprisingly, therefore, the Supreme Court has held that hotel employees may not validly consent to a search of an occupied hotel room without the guest's permission—during his authorized tenancy, he has a right to privacy in the space that the hotel cannot pierce. *See, e.g.*, *Stoner*, 376 U.S. at 489–90.

At checkout time, everything changes. At that point the housekeeping crew will need to—and has the authority to—access the room to clean and prepare it for the next registered guest, often on a very tight turnaround. A guest's doorhanger no longer bars entry. Accordingly, as the Second Circuit has held, after checkout time, even if a guest "ha[s] not completely vacated [his] room, the motel manager

ha[s] the right to enter and examine the room as if it had been relinquished," because the guest no longer has "sufficient control over the premises to establish a right to privacy therein." *United States v. Parizo*, 514 F.2d 52, 55 (2d Cir. 1975); *see also United States v. Akin*, 562 F.2d 459, 464 (7th Cir. 1977) (holding that "[s]ince the record supports the district court's conclusion that the rental period ended at the 1:00 [p.m.] check-out time rather than at 6:00 [p.m.] when an individual would be billed for an additional day, . . . the authorized representative of the hotel had the authority to consent to the search of the room" after 1:00 p.m.).

We hold, therefore, that a hotel guest loses his reasonable expectation of privacy in his room following checkout time, and that hotel management can validly consent to a search of the room at that point.[8] Because Ross had no cognizable privacy interest in Room 113 after 11:00 a.m., he has no Fourth

---

[8] We add the following commonsense caveat: If a guest asks for and receives a late checkout— say, from the standard 11:00 a.m. to 12:00 noon—then he retains his reasonable expectation of privacy until the arrival of the mutually agreed upon time. Because Ross neither sought nor received permission to extend his stay, we needn't explore our caveat's application here. To the extent, though, that some courts have held, more generally—and even absent express agreement between management and guest—that a hotel's "policies," "patterns," or "practices" can extend a guest's expectation of privacy beyond checkout time, *see, e.g.*, *United States v. Dorais*, 241 F.3d 1124, 1129 (9th Cir. 2001); *United States v. Kitchens*, 114 F.3d 29, 32 (4th Cir. 1997), we disagree. As the Sixth Circuit has explained, "[j]ust because a hotel does not change keycards at 11:00 a.m. [every day], or does not charge guests for an extra night every time they have not removed all of their personal items by 11:00 a.m., does not mean that the guest, as opposed to the hotel, retains control over the room." *United States v. Lanier*, 636 F.3d 228, 233 (6th Cir. 2011). "What the hotel may voluntarily give as a general matter it can take away in an individual instance, at least where the guest has not secured a promise from the hotel that he may stay late." *Id.* For the good of citizens and police alike, courts have long preferred clear Fourth Amendment rules, and extending a guest's reasonable expectation of privacy based on an uncommunicated and ethereal policy, pattern, or practice would only obscure matters.

24

Amendment standing to challenge the second, post-checkout-time search of the room.[9]  On that basis—and without considering the constitutionality of the second, consent-based search on the merits—we affirm the district court's denial of Ross's motion to suppress the drug-related evidence found during the post-checkout-time search.

## III

In sum, we hold as follows:

1.  The government has not carried its burden of demonstrating that Ross abandoned his motel room—and his reasonable expectation of privacy in it— before the initial entry and accompanying protective sweep, which officers

---

[9] There is one loose end.  Ross argues that he had a continuing possessory interest in Room 113 due to the motel's failure to honor Fla. Stat. § 509.141(1), which states that "[t]he operator of any public lodging establishment . . . may remove . . . in the manner hereinafter provided, any guest of the establishment . . . who . . . fails to check out by the time agreed upon in writing by the guest and public lodging establishment at check-in unless an extension of time is agreed to . . . prior to checkout."  The statute requires a hotel "operator [to] . . . notify such guest that the establishment no longer desires to entertain the guest and shall request that such guest immediately depart from the establishment"—if the guest doesn't comply, he is guilty of a second-degree misdemeanor.  *Id.* § 509.141(2)–(3).  Ross contends that because the motel didn't provide such notice to vacate before the search of his room, he still "had a continuing possessory interest in Room 113 . . . [and] hotel management did not possess the legal authority to consent to the search."  Reply Br. of Appellant at 10.

We agree with the government that nothing in § 509.141 justifies the conclusion that Ross continued to enjoy an exclusive right to occupy an unpaid-for room absent formal notice. Rather, the hotel's noncompliance with the statute simply means that Ross couldn't be charged with misdemeanor trespassing for his holdover.  *See, e.g.*, *Brown v. State*, 891 So. 2d 1120, 1122 (Fla. Dist. Ct. App. 2004).  Under Ross's expansive reading of the statute, an individual could maintain an indefinite possessory interest—and a reasonable expectation of privacy for Fourth Amendment purposes—in a hotel room as long as the hotel doesn't explicitly tell him to vacate. We don't think the statute can be read so broadly.

conducted no more than 10 minutes after he fled on foot.  Accordingly, Ross has

Fourth Amendment standing to challenge the entry and sweep, which resulted in

the seizure of the gun.

2.  Ross's challenge to the initial entry and sweep fails on the merits.

Because the officers had reason to believe that Ross was in Room 113, they had

authority to enter the room to execute their arrest warrants, to conduct a protective

sweep to ensure their safety, and to seize the gun, which they found in plain view.

3.  Ross forfeited any reasonable expectation of privacy in Room 113

following the 11:00 a.m. checkout time, at which point the motel's management

had the authority to consent to a search; accordingly, he has no Fourth Amendment

standing to challenge the ensuing search, during which officers discovered the

drug-related evidence.

**AFFIRMED.**

NEWSOM, Circuit Judge, concurring:

As noted in the main opinion, under our decision in *United States v. Sparks*, 806 F.3d 1323 (11th Cir. 2015), we are obliged to consider the government's argument—which it raises for the first time on appeal—that Ross abandoned Room 113, and any Fourth Amendment privacy interest therein, when he fled the motel on foot shortly after spotting the task-force officers in the parking lot.  *See* Maj. Op. at 11–13.  The reason:  *Sparks* holds that when a suspect abandons his possessory interest in the object of a search, the search causes him no "injury," and he thus has no "standing" to contest it—not just in the Fourth Amendment sense, but in the more fundamental Article III case-or-controversy sense.  *See Sparks*, 806 F.3d at 1339–41.  And because, *Sparks* says, a person must "of course" have standing "for a court to have jurisdiction," the abandonment issue "may not be waived for forfeited," and a reviewing court must if necessary consider the matter sua sponte.  *Id*. at 1340.  So, to put it slightly differently, even where, as here, "the issue of abandonment … ha[s] never been mentioned in the case previously," this Court "still ha[s] an obligation to consider whether the record show[s] abandonment because where abandonment occurs, we lack jurisdiction."  *Id*. at 1341 n.15.

For the reasons explained below, I'm not convinced that *Sparks* is correct—

27

indeed, I'm fairly well convinced that it's not, and I urge the Court to reconsider it en banc, either in this case or in another that properly presents the abandonment-as-Article-III-jurisdiction issue.

First, *Sparks* contravenes Supreme Court precedent, which has clearly, consistently, and recently distinguished between Fourth Amendment "standing" (scare quotes intended) and Article III standing. Most recently, in *Byrd v. United States*, the Court—building on its earlier decision in *Rakas v. Illinois*, 439 U.S. 128 (1978)—explained that while "[t]he concept of standing in Fourth Amendment cases can be a useful shorthand for capturing the idea that a person must have a cognizable Fourth Amendment interest in the place searched before seeking relief for an unconstitutional search," it "should not be confused with Article III standing, which is jurisdictional and must be assessed before" addressing other aspects of a Fourth Amendment claim. 138 S. Ct. 1518, 1530 (2018); *cf. also United States v. Leon*, 468 U.S. 897, 924 (1984) ("Defendants seeking suppression of the fruits of allegedly unconstitutional searches or seizures undoubtedly raise live controversies which Art. III empowers federal courts to adjudicate."). *Sparks*, it seems to me, "confuse[s]" Fourth Amendment standing and Article III standing in exactly the way that *Byrd* forbids.[1]

---

[1] Indeed, the *Sparks* opinion seems to bounce back and forth between traditional Article-III-standing phraseology and Fourth-Amendment-facing language. The decision begins its abandonment analysis with an Article III overview, *see* 806 F.3d at 1339 ("Article III of the

Second, *Sparks* bucks the general trend in the law—which the Supreme Court instituted and which we have faithfully followed—that courts should not "jurisdictionalize" issues that are more properly characterized as "claim-processing" rules or, as here, aspects of a party's merits case. *See, e.g., Orion Marine Constr., Inc. v. Carroll*, 918 F.3d 1323, 1328–29 (11th Cir. 2019); *Secretary v. Preston*, 873 F.3d 877, 881–82 (11th Cir. 2017); *cf. also Target Media Partners v. Specialty Marketing Corp.*, 881 F.3d 1279, 1292 (11th Cir. 2018) (Newsom, J., concurring) (observing that *Rooker-Feldman* doctrine has a tendency to unduly "jurisdictionalize" ordinary preclusion rules). *Sparks* takes an issue that is part and parcel of a Fourth Amendment claim on the merits—whether a suspect had but somehow relinquished a reasonable expectation of privacy in a place or thing—and converts it into a jurisdictional prerequisite.

Third, *Sparks* defies common sense. As the main opinion here points out, in the typical Fourth Amendment "standing" case—in which the controlling question is whether the defendant had a reasonable expectation of privacy in the first place—the government waives its standing objection by failing to raise it before

---

Constitution extends the jurisdiction of federal courts to 'Cases' and 'Controversies' only."); *id.* at 1340 ("[S]tanding requires a showing of injury in fact, causation, and redressability."), before verging into a discussion of Fourth Amendment basics, *id.* ("[I]f the person from whom the item was seized lacks a cognizable possessory interest in the item, that person's Fourth Amendment rights are not violated . . . ."), only to double back to Article III, *id.* at 1340–41 ("[F]ederal courts are 'obligated to inquire into subject matter jurisdiction *sua sponte* whenever it may be lacking,' and the issue may not be waived or forfeited.")—all in the span of four short paragraphs.

29

the district court. *See United States v. Gonzalez*, 71 F.3d 819, 827 n.18 (11th Cir. 1996) ("[S]ince the government declined to press this standing issue before the district court, we conclude that this issue has been waived."), *abrogated on other grounds by Arizona v. Gant*, 556 U.S. 332 (2009); *United States v. Kapperman*, 764 F.2d 786, 791 n.6 (11th Cir. 1985) ("Given the government's failure to raise th[e standing] question, we do not address it."). *Sparks* suggests that abandonment somehow uniquely implicates Article III subject-matter jurisdiction in a way that differentiates it from the typical scenario. That distinction strikes me as counterintuitive, if not 180° wrong. Why would a person who once had but later abandoned a reasonable expectation of privacy be un-"injured" in the Article III sense, while a person who never even had a reasonable expectation of privacy isn't? Either, it would seem, both persons are equally uninjured or, perhaps more likely, the latter individual—who never had a protectable privacy interest to begin with—is the *more* uninjured.

Fourth, *Sparks* offends—or is at the very least capable of offending—considerations of fundamental fairness. This case is Exhibit A. The government raised no abandonment issue in the district court, and that court (unsurprisingly) didn't address it. In his opening brief on appeal, therefore, Ross sensibly proceeded directly to the merits of his argument that the officers' initial entry and protective sweep of his motel room violated the Fourth Amendment—on the

30

ground that they had no "reasonable belief that [he] was located" in there. Br. of Appellant at 23. In so arguing, Ross asserted, among other things, that "it was objectively unreasonable to think that [he] would have returned to the room"—and, indeed, that "[t]he premise that [he] would have returned to the room was absurd." Br. of Appellant at 26. The government then filed an answering brief that led with the argument, never so much as mentioned before, that Ross had abandoned the room—and in so doing proceeded to clobber Ross with his opening brief's statements, making them a focus of its position. Br. of Appellee at 16–17. Rope-a-dope, bait-and-switch, whipsaw, whatever you want to call it—just doesn't seem very fair.

Finally, *Sparks* impedes sound judicial administration. This Court treats determinations regarding abandonment as findings of fact and reviews them only for clear error—which makes sense, as "[w]hether abandonment occurred is a question of intent." *United States v. Ramos*, 12 F.3d 1019, 1022–23 (11th Cir. 1994). By permitting the government to raise abandonment for the first time on appeal as a "jurisdictional" issue, *Sparks* thrusts this Court into the uncomfortable position of making a *de novo* determination of a purely factual issue, with respect to which there has been no fact-finding and no lower-court analysis. That strikes me as more than a little a little topsy-turvy—and unnecessarily so.

\* \* \*

31

*Sparks* seems not just wrong to me, but also wrongheaded.  I urge the Court to revisit it en banc and to clarify that a suspect's alleged abandonment of his privacy interest in a place or thing—just like the absence of a reasonable expectation of privacy in the first place—is an issue that runs to the merits of his Fourth Amendment claim rather than Article III jurisdiction, and that the government waives any abandonment-based standing argument by failing to raise it in the district court.