[PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT

_____

No. 18-11679

_____

D.C. Docket No. 3:17-cr-00086-MCR-1

UNITED STATES OF AMERICA,

Plaintiff - Appellee,

versus

WALI EBBIN RASHEE ROSS,
a.k.a. Wali Ibn Ross,
a.k.a. Wal Ebbin Rashee Ross,

Defendant - Appellant.

_____

Appeal from the United States District Court
for the Northern District of Florida

_____

(June 24, 2020)

Before WILLIAM PRYOR, Chief Judge, ED CARNES, WILSON, MARTIN,
JORDAN, ROSENBAUM, JILL PRYOR, NEWSOM, BRANCH, GRANT,
LUCK, and LAGOA, Circuit Judges.

NEWSOM, Circuit Judge, delivered the opinion of the Court, in which WILLIAM
PRYOR, Chief Judge, and ED CARNES, WILSON, MARTIN, JORDAN,

ROSENBAUM, JILL PRYOR, BRANCH, GRANT, LUCK, and LAGOA, Circuit Judges, joined.

ROSENBAUM, Circuit Judge, filed a concurring opinion.

NEWSOM, Circuit Judge:

Sometimes courts make simple mistakes. And simple mistakes call for simple fixes. Just so here. In *United States v. Sparks*, we held that a suspect who "abandons" his privacy or possessory interest in the object of a search or seizure suffers no "injury"—and thus has no standing—in the Article III sense, and, accordingly, that an argument asserting the suspect's abandonment is jurisdictional, nonwaivable, and subject to *sua sponte* consideration. 806 F.3d 1323, 1341 n.15 (11th Cir. 2015). Sitting en banc, we now overrule *Sparks* and hold, to the contrary, that a suspect's alleged abandonment implicates only the merits of his Fourth Amendment challenge—not his Article III standing—and, accordingly, that if the government fails to argue abandonment, it waives the issue.

**I**

This case arises out of the denial of a defendant's motion to suppress evidence found in two separate, warrantless searches of his motel room—the first turned up a gun; the second, drugs and associated paraphernalia. On appeal, the defendant, Wali Ross, challenged the constitutionality of both searches. In response, the government not only defended the searches on the merits, but also asserted, for the first time, that Ross had "abandoned" his room and any privacy

2

interest therein and that he therefore lacked standing to assert his Fourth Amendment rights.  We must decide whether the government waived its abandonment argument by failing to raise it in the district court.

## A

Early on the morning of July 21, 2017, a joint state-federal task force gathered outside a Pensacola motel to arrest Wali Ross on three outstanding felony warrants—for trafficking hydrocodone, failure to appear on a battery charge, and failure to appear on a controlled-substances charge.  Although the officers had information that Ross was staying at the motel, he wasn't a registered guest, so they set up surveillance around the building and waited for him to make an appearance.  The officers knew that Ross was a fugitive who had a history of violence and drug crimes.

Sometime between 9:00 and 9:30 a.m., Special Agent Jeremy England saw Ross leave Room 113, head for a truck, return to his room briefly, and then approach the truck again.  When Ross spotted the officers, he made a break for it, scaling a chain-link fence and running toward the adjacent Interstate 10.  The officers went after Ross, but when they reached the opposite side of the interstate to intercept him, he wasn't there.  In the meantime, it dawned on Agent England that none of the officers had stayed behind at the motel, and he feared that Ross might have doubled back to the room unnoticed.  So, about ten minutes after the

3

chase began, Agent England and Detective William Wheeler returned to the motel to see if Ross had snuck back into his room. The door to Room 113 was closed, and Ross's truck remained in the parking lot.

Detective Wheeler obtained a room key and a copy of the room's registration from the front desk—the latter showed that Room 113 was rented for one night to a woman named Donicia Wilson. (Although the name meant nothing to the officers at the time, they later learned that Ross was "a friend of a friend" of Wilson's husband; she had rented the room after she and her husband refused Ross's request to spend the night at their home because they had children and didn't know him very well.) Using the key, Agent England and Detective Wheeler entered Room 113 to execute the warrants and arrest Ross; they entered without knocking, as they believed that someone inside—Ross, a third party, or both— might pose a threat to them. Agent England testified that because Ross had a history of violence it was "just protocol" to operate on the premise that there would "possibly [be] someone [in the motel room] to hurt" them—in light of that risk, he said, the officers "made a tactical entry into the room." Once inside, they conducted a quick protective sweep, and on their way out Agent England saw in plain view a grocery bag in which the outline of a firearm was clearly visible. Agent England seized the gun, touched nothing else, and left.

Deputy U.S. Marshal Nicole Dugan notified ATF about the gun while Agent England and Detective Wheeler continued to surveil the motel. ATF Special Agent Kimberly Suhi arrived at the motel around 10:45 a.m. to retrieve the firearm. The motel's manager, Karen Nelson, told Agent Suhi that she could search Room 113 after the motel's standard 11:00 a.m. checkout time; up until that point, Suhi testified, Nelson "st[ood] in the doorway of the room" to "mak[e] sure no one was entering."[1] Nelson explained that if it looked like a guest was still using his room at checkout time, she might place a courtesy call to ask if he wanted to stay longer; otherwise, she said, motel management assumed that every guest had departed by 11:00 a.m., at which point housekeepers would enter the room to clean it. Nelson also explained that it was the motel's policy to inventory and store any items that guests left in their rooms and to notify law enforcement if they found any weapons or contraband.

At 11:00 a.m., Agent Suhi again sought and received Nelson's permission to search Room 113. When ATF agents entered the room, they found a cell phone and a Crown Royal bag filled with packets of different controlled substances— including around 12 grams of a heroin-laced mixture—cigars, and a digital scale.

---

[1] Nelson testified that she had arrived at work after Ross fled from police, that she hadn't seen anyone enter the room, and that she had no knowledge of the officers' earlier entry and sweep.

**B**

**1**

Ross was charged with one count of being a felon in possession of a firearm and ammunition, one count of knowingly possessing heroin with intent to distribute, one count of firearms-related forfeiture, and one count of forfeiture related to the property and proceeds obtained by a controlled-substances violation. He moved to suppress the evidence found in both searches of Room 113. In his motion, Ross argued that the officers' initial entry—and the ensuing protective sweep, which turned up the gun—violated the Fourth Amendment "because there were no grounds for them to believe that a dangerous individual (or anyone) was inside the room." He asserted that "it would have been unrealistic for the officers to believe that [he] had returned to the room and was inside at that time (after fleeing from them)." Accordingly, he said, the officers didn't have the requisite reasonable belief either to enter the room or to conduct the sweep. Ross also argued that the second search—which was conducted with Nelson's permission just after 11:00 a.m., and in which the drugs were discovered—violated the Fourth Amendment "regardless of the alleged consent of the hotel management because it would not have occurred absent the illegal first search." According to Ross, "[t]he illegal seizure of the firearm . . . directly [led] to the agents' desire to conduct the second search and their discussion with management to try to get its consent."

With respect to the initial entry and protective sweep, the government responded (1) that because the officers couldn't find Ross near the interstate, they had reason to believe that he had returned to his motel room; (2) that Ross's multiple drug- and violence-related felony arrest warrants led the officers to conclude that he could be armed and dangerous; and (3) in addition, that exigent circumstances justified the entry, as "there was a definite likelihood that further delay could cause the escape of the defendant" and "jeopardize the safety of the officers and the public." With respect to the second search, the government argued that Ross had no reasonable expectation of privacy in Room 113 after the 11:00 a.m. checkout time and that, in any event, the search was valid because the officers reasonably believed that Nelson had the authority to consent to the search. The government further contended that even if the second search was tainted, motel staff would inevitably have entered the room after checkout time and alerted police when they found the gun in plain view.

The district court denied Ross's motion to suppress. With respect to the initial entry and sweep, the court found that "[t]he arrest warrant granted officers a limited ability to enter to effectuate the arrest on [their] reasonable belief that Ross was in the room." Moreover, the court observed, the fact that Room 113 was not registered in Ross's name gave the officers "reason to be concerned that someone else might be in the room as well." Finally, the court held that "the chase and the

fact that the officers lost sight of Ross presented exigent circumstances" that further justified the sweep—because the officers were in hot pursuit of a suspect with a history of violent activity for whom they had an arrest warrant, and who reasonably could have returned to the room, the first search was lawful.

With respect to the second search, the district court concluded that after checkout time, Ross—who hadn't requested a late checkout or paid for an additional day—had no protectible privacy interest in the room. The court separately held that even if the initial entry and sweep were unlawful, Nelson's consent provided ample authority for the officers' post-checkout search. Finally, the court found that the inevitable-discovery and independent-source doctrines applied—either motel employees would have found the incriminating evidence when cleaning Room 113 after checkout time, or the task-force officers would have eventually searched the room.

Ross pleaded guilty to possession of a firearm and ammunition by a convicted felon and possession with intent to distribute heroin, reserving the right to appeal the denial of his motion to suppress.

**2**

On appeal, both parties made essentially the same arguments that they had made in the district court—with, as particularly relevant here, one very important exception: In its response brief, the government raised a new challenge to Ross's

8

motion to suppress—namely, that when Ross fled the motel, he "abandoned" Room 113 and with it any reasonable expectation of privacy therein, and accordingly, that he lacked "standing" to contest either search.

By way of background, in his opening appellate brief, Ross had proceeded straight to the merits of his Fourth Amendment claims—understandably, given that no one had said anything about abandonment in the district court. Significantly here, with respect to the first search, Ross argued that the officers had violated the Fourth Amendment because they had no "reasonable belief that [he] was located" in Room 113. Br. of Appellant at 23. Indeed, he went so far as to say that "it was objectively unreasonable to think that [he] would have returned to [his motel] room for a number of reasons" and that "[t]he premise that [he] would have returned to the room was absurd." *Id.* at 26. Using Ross's own words against him, the government led off its answering brief with the (new) contention that he had abandoned his motel room before the searches in question. That meant, the government argued, that Ross lacked Fourth Amendment "standing" to challenge their constitutionality.

In its opinion, a three-judge panel of this Court observed that before it could address the merits of the government's abandonment argument, it first had to deal with a threshold procedural wrinkle—namely, that the government hadn't argued abandonment in the district court. *United States v. Ross*, 941 F.3d 1058, 1065

(11th Cir. 2019), *opinion vacated and reh'g en banc granted*, 953 F.3d 744 (11th Cir. 2020). That failure, the panel said, teed up the question whether the government had waived its Fourth Amendment standing objection vis-à-vis the initial entry and sweep of Ross's room. *Id.*

The panel observed that, ordinarily, when the government fails to contest a defendant's Fourth Amendment standing before the district court, it waives the issue for appellate purposes. *Id.* (citing *United States v. Gonzalez*, 71 F.3d 819, 827 n.18 (11th Cir. 1996), *abrogated on other grounds by Arizona v. Gant*, 556 U.S. 332 (2009), and *United States v. Kapperman*, 764 F.2d 786, 791 n.6 (11th Cir. 1985)). But the panel acknowledged the government's contention that a different rule applied in this case under our decision in *United States v. Sparks*, 806 F.3d 1323 (11th Cir. 2015). There, the panel summarized, we had held that "where a defendant has abandoned a premises, he suffers no injury from a search of it—and therefore has no standing in *either* the Fourth Amendment sense *or* the Article III sense." *Id.* (citing *Sparks*, 806 F.3d at 1341 n.15). Because the *Sparks* court had determined that abandonment implicates Article III standing—and thus subject matter jurisdiction—it held that abandonment isn't waivable, distinguishing it from other challenges to Fourth Amendment standing. *Id.*

The panel in this case expressed serious "misgivings about the correctness of *Sparks*," noting that it "seem[ed] to confuse Fourth Amendment and Article III

10

standing in precisely the way that the Supreme Court has forbidden." *Id.* at 1065 (alteration adopted) (citing *Byrd v. United States*, 138 S. Ct. 1518, 1530 (2018), for the proposition that "[t]he concept of standing in Fourth Amendment cases can be a useful shorthand for capturing the idea that a person must have a cognizable Fourth Amendment interest in the place searched before seeking relief for an unconstitutional search; but it should not be confused with Article III standing, which is jurisdictional and must be assessed before reaching the merits"). Even so, the panel concluded that it was "bound by *Sparks*'s holding that where, as here, the challenge to Fourth Amendment standing results from a defendant's alleged act of abandonment, the challenge . . . implicates Article III jurisdiction, rendering it non-waivable." *Id.* at 1065–66 (citing *Breslow v. Wells Fargo Bank, N.A.*, 755 F.3d 1265, 1267 (11th Cir. 2014) ("[I]t is the firmly established rule of this Circuit that each succeeding panel is bound by the holding of the first panel to address an issue of law, unless and until that holding is overruled en banc, or by the Supreme Court." (alteration in original) (quotation omitted))). Accordingly, the panel proceeded to address the government's abandonment argument on the merits. *Id.* at 1066.

The panel ultimately held that "[t]he government ha[d] not carried its burden of demonstrating that Ross abandoned his motel room" and thus concluded that Ross had Fourth Amendment standing to challenge the officers' initial entry and

11

sweep. *Id.* at 1071. On the merits, though, the panel affirmed the denial of Ross's motion to suppress. *Id.* at 1071–72. With respect to the first search, which turned up the gun, the panel held that "the officers had reason to believe that Ross was in Room 113" and, accordingly, that "they had authority to enter the room to execute their arrest warrants, to conduct a protective sweep to ensure their safety, and to seize the gun, which they found in plain view." *Id.* With respect to the second search, which turned up the drugs and associated paraphernalia, the panel held that "Ross forfeited any reasonable expectation of privacy in Room 113 following the 11:00 a.m. checkout time, at which point the motel's management had the authority to consent to a search." *Id*. at 1072.

*    *    *

We vacated the panel's opinion and took this case en banc to reevaluate the merits of *Sparks*'s holding that a suspect's alleged abandonment of a place or thing implicates his Article III standing to challenge a search of it—and, therefore, that the government cannot waive an abandonment argument. We now expressly overrule *Sparks* to the extent it so holds. Supreme Court precedent, the consensus among our sister circuits, and important practical considerations combine to demonstrate that a suspect's abandonment implicates only the merits of his Fourth Amendment claim, not his standing in the Article III sense, and, accordingly, that if the government fails to argue abandonment, it waives the issue.

12

## II

We begin with a brief primer on the underlying constitutional provisions and doctrines at play:  The Fourth Amendment guarantees "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures."  U.S. Const. amend. IV.  The Amendment's protections extend to any thing or place with respect to which a person has a "reasonable expectation of privacy," *California v. Ciraolo*, 476 U.S. 207, 211 (1986) (quoting *Katz v. United States*, 389 U.S. 347, 360 (1967) (Harlan, J., concurring)), including hotel rooms, *see e.g.*, *Stoner v. California*, 376 U.S. 483, 490 (1964).  By contrast, an individual's Fourth Amendment rights are *not* infringed—or even implicated— by a search of a thing or place in which he has no reasonable expectation of privacy.  *See e.g.*, *United States v. Brazel*, 102 F.3d 1120, 1147 (11th Cir. 1997). This threshold issue—whether an individual has a reasonable expectation of privacy in the object of the challenged search—has come to be known colloquially (but as it turns out misleadingly) as Fourth Amendment "standing."

Article III standing is a different animal altogether.  Briefly, Article III of the Constitution grants federal courts jurisdiction only over "Cases" and "Controversies."  U.S. Const. art. III, § 2.  One "strand[]" of Article III's case-or-controversy requirement is "standing."  *Christian Coal. of Fla., Inc. v. United States*, 662 F.3d 1182, 1189 (11th Cir. 2011).  Article III standing "limits the

13

category of litigants empowered to maintain a lawsuit in federal court to seek redress for a legal wrong," *Spokeo, Inc. v. Robins*, 136 S. Ct. 1540, 1547 (2016), and it "is a threshold jurisdictional question which must be addressed prior to and independent of the merits of a party's claims," *AT&T Mobility, LLC v. Nat'l Ass'n for Stock Car Auto Racing, Inc.*, 494 F.3d 1356, 1359 (11th Cir. 2007) (quotation omitted). "In fact, we are obliged to consider standing *sua sponte* even if the parties have not raised the issue." *Id.* at 1360.

With that background, we reconsider whether, as we held in *Sparks*, a suspect who abandons his possessory interest in the object of a search suffers no "injury," and thus lacks standing to contest the search—not just in the Fourth Amendment sense, but also in the more fundamental Article III case-or-controversy sense. Overruling *Sparks*, we now hold that a suspect's alleged abandonment runs only to the merits of his constitutional claim, and not his Article III standing to challenge the search.

We do so for several reasons.

**A**

As an initial matter, the rule that we adopted in *Sparks* contravenes Supreme Court precedent in two important respects. First, and most obviously, the Supreme Court has clearly and consistently distinguished between Fourth Amendment "standing" (scare quotes intended) and Article III standing. Most recently, in *Byrd*

14

*v. United States*, the Court—building on its earlier decision in *Rakas v. Illinois*, 439 U.S. 128 (1978)—explained that while "[t]he concept of standing in Fourth Amendment cases can be a useful shorthand for capturing the idea that a person must have a cognizable Fourth Amendment interest in the place searched before seeking relief for an unconstitutional search," it "should not be confused with Article III standing, which is jurisdictional and must be assessed before" addressing other aspects of a Fourth Amendment claim. 138 S. Ct. 1518, 1530 (2018); *see also Rakas*, 439 U.S. at 140 (holding that the question of whether a defendant has a right to challenge a search "belongs more properly under the heading of substantive Fourth Amendment doctrine than under the heading of [Article III] standing").[2]  Our *Sparks* decision, we now recognize, inadvertently "confused" so-called Fourth Amendment "standing" and true-blue Article III standing in exactly the way that the Supreme Court has forbidden. 138 S. Ct. at 1530.

Second, and more generally, the rule that we embraced in *Sparks* violates the Supreme Court's directive that courts should avoid "jurisdictionalizing" issues that are more properly characterized as "claim-processing" rules or, as here, aspects of

---

[2] *Cf. also Minnesota v. Carter*, 525 U.S. 83, 87 (1998) (noting the "express[] reject[ion]" of the idea that the expectation-of-privacy analysis should be conducted "under the rubric of 'standing' doctrine"); *United States v. Leon*, 468 U.S. 897, 924 (1984) ("Defendants seeking suppression of the fruits of allegedly unconstitutional searches or seizures undoubtedly raise live controversies which Art. III empowers federal courts to adjudicate.").

a party's merits case.  *See, e.g.*, *United States v. Kwai Fun Wong*, 575 U.S. 402, 409–10 (2015); *Henderson ex rel. Henderson v. Shinseki*, 562 U.S. 428, 438–39 (2011); *Union Pac. R.R. Co. v. Bhd. of Locomotive Eng'rs and Trainmen Gen. Comm. of Adjustment*, 558 U.S. 67, 81–82 (2009).  We have tried to be careful to heed the Supreme Court's instruction.  *See, e.g.*, *Orion Marine Constr., Inc. v. Carroll*, 918 F.3d 1323, 1328–29 (11th Cir. 2019) (discussing the "distinction between true jurisdictional limitations and non-jurisdictional claim-processing rules" (internal quotation marks and citations omitted)); *Sec'y, U.S. Dep't of Labor v. Preston*, 873 F.3d 877, 881–82 (11th Cir. 2017) (similar).  Our decision in *Sparks* marked a departure from this consistent trend, in that it took an issue that is part and parcel of a Fourth Amendment claim on the merits—whether a suspect had but somehow relinquished a privacy interest in a place or thing—and mistakenly treated it as an Article III-based jurisdictional prerequisite.

**B**

Interring *Sparks* will also bring us into line with our sister circuits, which have overwhelmingly (if not quite uniformly) treated abandonment as an issue that runs to the merits of a suspect's Fourth Amendment challenge, rather than his Article III standing.

*United States v. Drummond*, 925 F.3d 681 (4th Cir. 2019), is illustrative. After law-enforcement officers got a tip that an individual was selling drugs out of

16

a motel room, they entered the room with permission from an occupant, found evidence of drug use, and used that evidence to procure a search warrant. *Id.* at 685–86. The ensuing warranted search uncovered "firearms, ammunition, multiple baggies with methamphetamine residue, and various items of drug paraphernalia, including hypodermic needles." *Id.* at 686. The defendant—Drummond—was one of seven people inside the room at the time of the officers' entry, and as part of their search the police went through a backpack that they had found near his feet. *Id.* at 685–86. In it, "the officers found a Smith & Wesson .38 caliber revolver, fully loaded with .38 caliber rounds, a Crown Royal bag containing additional .38 caliber ammunition, and job-related paperwork in Drummond's name." *Id.* at 686.

In the district court, Drummond "moved to suppress the evidence seized in the search, asserting that the search warrant was not supported by probable cause." *Id.* For its part, the government argued (1) that as a mere "social guest," Drummond had no reasonable expectation of privacy in the motel room and (2) that, in any event, the search warrant was supported by probable cause. *Id.* at 686, 688 n.1. The district court denied Drummond's motion to suppress, and he appealed. *Id.* at 686. On appeal, the government asserted an additional argument, "as a new ground to affirm"—namely, "that Drummond [had] abandoned ownership of the backpack during the search." *Id.* at 688 n.1. The Fourth Circuit, though, declined to consider the government's late-breaking abandonment

17

argument. *Id.* In so doing, it quoted *Byrd* for the proposition that "[b]ecause Fourth Amendment standing is subsumed under substantive Fourth Amendment doctrine, it is not a jurisdictional question and hence need not be addressed before addressing other aspects of the merits of a Fourth Amendment claim." *Id.* (quoting *Byrd*, 138 S. Ct. at 1530).

The Sixth Circuit's decision in *United States v. Dyer*, 580 F.3d 386 (6th Cir. 2009), is similar. In that case, law-enforcement officers received a tip that the defendant—Dyer—and another individual were selling drugs out of a rental cabin. *Id.* at 388. The officers obtained a search warrant and drove to the cabin, where they saw Dyer and another individual leave the building and get into a car. *Id.* at 389. The officers tried to intercept the pair, but Dyer "rammed the car into [a] police car[], rendering the [police] car undrivable, and fled the scene." *Id.* The officers returned to and were granted access to the cabin, where they found drugs and related paraphernalia. *Id.*

When Dyer moved to suppress the evidence found in the cabin, a magistrate judge initially recommended denial on two separate grounds—(1) that Dyer had no Fourth Amendment "standing" to challenge the search, both because he wasn't registered as a guest and because he had "abandoned [the cabin] by fleeing from the police and never returning"; and (2) that the warrant was supported by probable cause. *Id.* The district court disagreed on the first count but agreed on the second.

It concluded that Dyer had the requisite standing—as an overnight guest he had a privacy interest in the cabin, and he hadn't "abandon[ed] his property because when he left the cabin, he was planning to return"—but nonetheless held that the warrant was supported by probable cause. *Id*. On appeal, the Sixth Circuit affirmed on the ground that the warrant was valid. *Id.* at 393. Notably for our purposes, the Sixth Circuit observed that the government "ha[d] not appealed" the district court's adverse standing-based determinations and had thereby "waived the issue." *Id*. at 390. The court accordingly "assume[d] standing for purposes of the Fourth Amendment and proceed[ed] to address the merits of Dyer's claims." *Id.*

One more: In *United States v. Garay*, the Ninth Circuit explicitly rejected the government's position that abandonment is "a threshold issue" that a court must consider before getting to the meat of a defendant's Fourth Amendment challenge. 938 F.3d 1108, 1111 (9th Cir. 2019). There, the eventual defendant—Garay—led police on a high-speed chase, crashed his car into a ditch, and then "fle[d] on foot." *Id*. at 1110. The police impounded the car and recovered a number of items from it, including a cellphone, and thereafter obtained a warrant to search the phone's contents. *Id*. In the district court, Garay unsuccessfully moved to suppress evidence found on the phone on the grounds that the officers' initial seizure of the phone was unreasonable and that the warrant authorizing their subsequent search of its contents was inadequate. *Id*.

19

On appeal, the Ninth Circuit initially noted the government's contention that Garay had "abandoned any reasonable expectation of privacy he may have had in the contents of his phone when he left it in a totaled car and tried to flee from the arresting officers." *Id*. at 1111. Garay's abandonment, the government insisted, was "a threshold issue that prevent[ed him] from having standing to challenge the search or seizure of the phone." *Id*. The Ninth Circuit, though, declined to "decide whether Garay abandoned all reasonable expectation of privacy in [his] cell phone." *Id*. Quoting *Byrd*, the court emphasized that "Fourth Amendment standing, unlike Article III standing in the civil context, is 'not a jurisdictional question and hence need not be addressed before addressing other aspects of the merits of a Fourth Amendment claim.'" *Id.* (quoting *Byrd*, 138 S. Ct. at 1530).

You get the point. Correcting *Sparks*'s holding on abandonment not only brings us into compliance with Supreme Court precedent, but also aligns us with other circuits' Fourth Amendment standing jurisprudence.[3]

---

[3] The lone outlier seems to be the Eighth Circuit. In *United States v. Rodriguez-Arreola*, that court, citing Article III precedent, treated a Fourth Amendment standing objection as nonwaivable on the ground that it pertained to justiciability. 270 F.3d 611, 616–17 (8th Cir. 2001). Notably, though, the court's holding there seems to conflict with its earlier decision in *United States v. Morales*, which held that the government had waived a Fourth Amendment standing argument by asserting abandonment for the first time on appeal. 737 F.2d 761, 763–64 (8th Cir. 1984). In any event, for the reasons explained in text, we are not convinced by the *Rodriguez-Arreola* court's suggestion that Fourth Amendment "standing" is fairly equated with true Article III standing.

20

## III

Finally, doctrine aside, treating abandonment as an ordinary (and waivable) aspect of a defendant's Fourth Amendment challenge on the merits just makes sense. The rule that we adopted in *Sparks* threatened unintended consequences—namely, (1) producing incongruous results among Fourth Amendment cases, (2) jeopardizing the fairness of judicial proceedings, and (3) impeding sound judicial administration. Scrapping it will minimize those threats.

For starters, the *Sparks* rule risked producing dissonant results in similar Fourth Amendment cases. All agree that in the typical Fourth Amendment "standing" case—in which the controlling question is whether the defendant had a reasonable expectation of privacy in the first place—the government waives any standing objection that it fails to raise. *See Gonzalez*, 71 F.3d at 827 n.18 ("[S]ince the government declined to press this standing issue before the district court, we conclude that this issue has been waived."); *Kapperman*, 764 F.2d at 791 n.6 ("Given the government's failure to raise th[e standing] question, we do not address it."). Our decision in *Sparks*—the result of understandable confusion over the "standing" label's insidious creep into Fourth Amendment jurisprudence—gave the impression that abandonment somehow uniquely implicates Article III subject-matter jurisdiction in a way that differentiates it from that typical scenario. That, we now clarify, is incorrect. After all, what logic would counsel the

conclusion that a person who once had but later abandoned a reasonable expectation of privacy *does not* suffer an Article III injury, whereas a person who never had a reasonable expectation of privacy in the first place *does*? Either, it would seem, both persons are equally uninjured or, perhaps more likely, the latter individual—who never had a protectable privacy interest to begin with—is the *more* uninjured. In any event, applying different standing rules depending on how and when a suspect lost his reasonable expectation of privacy—Fourth Amendment "standing" if he never had it, Article III standing if he had but then lost it—makes little sense.

Separately, it has become clear that the rule we adopted in *Sparks* can lend itself to unfair application. This case is a good (which is to say bad) example. The government raised no abandonment issue in the district court, and that court (unsurprisingly) didn't address it. In his opening brief on appeal, therefore, Ross sensibly proceeded straight to the merits of his argument that the officers' initial entry and protective sweep of his motel room violated the Fourth Amendment—on the ground that they had no "reasonable belief that [he] was located" in there. Br. of Appellant at 23. In so arguing, Ross asserted, among other things, that "it was objectively unreasonable to think that [he] would have returned to the room"—and, indeed, that "[t]he premise that [he] would have returned to the room was absurd." *Id.* at 26. The government then filed an answering brief that led with the argument,

22

never mentioned before, that Ross had abandoned the room—and in so doing proceeded to clobber Ross with his opening brief's statements, making them a focus of its position. Br. of Appellee at 16–17. Allowing the government to whipsaw a defendant like that strikes us as, well, unfair.

Finally, the *Sparks* rule would impede sound judicial administration. This Court treats determinations regarding abandonment as findings of fact and reviews them only for clear error—which makes sense, because "[w]hether abandonment occurred is a question of intent." *United States v. Ramos*, 12 F.3d 1019, 1022–23 (11th Cir. 1994). Permitting the government to raise abandonment for the first time on appeal as a "jurisdictional" issue would threaten to thrust this Court into the uncomfortable position of making a de novo determination of a purely factual issue, with respect to which there has been no fact-finding and no lower-court analysis.

## IV

For the foregoing reasons, we overrule *Sparks* to the extent that it holds that abandonment implicates Article III standing and is therefore a jurisdictional issue that the government can't waive and that courts should raise *sua sponte*. We hold, to the contrary, that a party's abandonment of a place or thing runs to the merits of his Fourth Amendment challenge and, accordingly, that if the government fails to argue abandonment it waives the issue.

We **REMAND** this case to the panel for proceedings consistent with this opinion.

ROSENBAUM, Circuit Judge, concurring:

I concur in the abrogation of the holding in *United States v. Sparks*, 806 F.3d 1323, 1341 n.15 (11th Cir. 2015), that a suspect who abandons her privacy or possessory interest in the object of a search or seizure and thus does not enjoy Fourth Amendment standing also lacks Article III standing. As the writer of the *Sparks* opinion, I regret my error and appreciate the Court's correction of our Circuit's jurisprudence.