[PUBLISH]

In the

# United States Court of Appeals

## For the Eleventh Circuit

_____

No. 19-11669

_____

UNITED STATES OF AMERICA,

Plaintiff-Appellee,

*versus*

BRUCE MITCHELL NICHOLSON,

Defendant-Appellant.

_____

Appeal from the United States District Court
for the Northern District of Alabama
D.C. Docket No. 2:15-cr-00418-MHH-JHE-1

_____

Before JILL PRYOR, LUCK, and BRASHER, Circuit Judges.

BRASHER, Circuit Judge:

Bruce Nicholson, an Alabama man convicted of federal child sex crimes and sentenced to life in prison, challenges his conviction on direct appeal. The main question in this criminal appeal is, as it often is, whether a criminal should "go free because the constable has blundered." *People v. Defore*, 150 N.E. 585, 587 (N.Y. 1926). Nicholson was convicted of heinous crimes—the long-term sexual exploitation of two children that came to light only after one became pregnant and he spirited both away across the country. But the FBI dawdled during its investigation. The FBI let physical evidence sit in a wrecker service's office in Kentucky for months before securing a warrant to seize it. And it searched a laptop seized in New York six months after its warrant's deadline. Nonetheless, the answer to the question on appeal is that the constable's blunders do not warrant reversing Nicholson's conviction as a matter of law. Accordingly, after careful consideration and with the benefit of oral argument, we affirm.

## I.    BACKGROUND

Nicholson's conviction arises out of his interactions with two young girls: JF and KM. Nicholson had close personal relationships with both children and subjected each to sexual abuse from an early age. JF is Nicholson's daughter by Rebecca Ford, his long-term girlfriend, and KM is Ford's daughter from a previous relationship. Although KM and Nicholson are not biologically related,

she viewed him as her father and would often refer to him as "[d]ad" or "daddy."

### A.    Nicholson sexually abuses KM and JF.

JF and KM lived with Ford and Nicholson from JF's birth in 1998 to 2008. During that ten-year period, Nicholson repeatedly sexually abused both girls.

Nicholson began abusing KM, the older of the two children, when she was six or seven years old. He performed oral sex on KM, had her perform oral sex on him, touched her genitals, and used sex toys on her. Nicholson, who was employed as a truck driver, would bring KM along on work trips and continue the abuse while the two were traveling. Nicholson regularly viewed child pornography in KM's presence and showed her child pornography to explain what he wanted her to do with him.

JF, the younger child, was about seven years old when Nicholson first touched her genitals during a bath. After JF told a school counselor and her mother about the abuse, Nicholson threatened that he would stop loving her if she told anyone else. Afterwards, Nicholson continued to have sexual contact with JF, sometimes going to her bedroom and sometimes bringing her to his. When JF was eight or nine years old, Nicholson conducted what he called a "fashion show," during which he used a green camera to take sexually explicit pictures of JF and KM. He photographed the girls naked and wearing lingerie that he had purchased for them. During the "fashion show," Nicholson performed oral

sex on both girls. He would do so repeatedly during the ten-year period that the three lived together. Just as he did with KM, Nicholson showed JF child pornography. He also asked KM to teach and encourage JF so that she would perform the same sexual acts that KM did. Nicholson specifically wanted KM to teach JF "[t]o not be shy, to open up more, [and] to be more non-resistant."

In 2008, KM (then about twelve or thirteen years old) and JF (about ten years old) were removed from Nicholson and Ford's custody and went to live with Janet and Mark Baker, relatives of Ford's. When Janet Baker arrived at Nicholson's house to pick up the girls' belongings, she discovered light-up high heels "for women who worked in nightclubs," women's lingerie, and "very small dresses." KM told Baker that all these items were hers.

Despite moving in with the Bakers, JF and KM had regular weekend overnight visits with Nicholson, and his abuse of the girls continued. KM received a cellphone soon after the move that she used to text with Nicholson. Nicholson used his access to KM to solicit nude photos from her, requesting over text that she "send him something pretty." KM understood this request for what it was and complied, taking a picture of her genitals using her phone and sending it to Nicholson.

Two-and-a-half years after the girls were removed from Nicholson and Ford's home, Nicholson regained custody of JF. Although KM stayed with the Bakers, she continued her overnight visits with Nicholson, where she would stay in his room. Throughout this period, Nicholson continued to sexually abuse KM. He

escalated that abuse to vaginal intercourse beginning when KM was fourteen or fifteen years old.

When she was about sixteen years old, KM became pregnant by Nicholson. Nicholson continued having sex with KM after he learned that she was pregnant and was excited at the prospect that the child might be a girl. Nicholson also continued and escalated his abuse of JF, performing oral sex on her and attempting for the first time "to insert his fingers into [JF's] genitalia."

B.    *Nicholson takes the girls across state lines and is arrested.*

In June 2012, Nicholson left Alabama with JF and KM "[b]ecause [KM] was pregnant and showing and [Nicholson] got scared." KM expected the move to be permanent, left her car in Alabama, and left a note for the Bakers. KM brought the lingerie that Nicholson had purchased for her. Initially, Nicholson took the girls to Florida. When "word had gotten out that [JF and KM] were missing," Nicholson left Florida, traveled through the Carolinas, and eventually arrived in New York. Along the way, Nicholson continued to have sex with KM.

In New York, Nicholson got a job driving eighteen-wheeler trucks for a company he had previously worked for in Alabama. He then left the vehicle that he had driven to that point, a Ford F-150, in the company's parking lot in New York, taking JF and KM with him in one of the company's eighteen-wheelers. While traveling in the eighteen-wheeler, Nicholson had KM sleep with him in his bunk and continued to perform oral sex on her.

When JF and KM disappeared, Baker contacted the local police department, which opened an investigation resulting in the issuance of a state arrest warrant charging Nicholson with interference with child custody. The FBI also became involved in the investigation, obtaining a federal arrest warrant for unlawful flight to avoid prosecution.

About a month after the girls were taken, the FBI discovered that Nicholson had been hired to drive an eighteen-wheeler and developed a plan to arrest him on his route. At the FBI's request, state police stopped the eighteen-wheeler in Kentucky and arrested Nicholson. FBI agents on the scene took custody of the girls. As part of a "cover story," neither JF nor KM mentioned their abuse in their initial interview with law enforcement. During a follow-up interview, however, KM told the FBI about the abuse "[b]ecause [she] had two babies in [her] belly to worry about, not [Nicholson]."

Although the FBI coordinated the nationwide search for Nicholson and two FBI agents arrived at the scene shortly after his arrest in Kentucky, the FBI did not search the eighteen-wheeler. Instead, after Nicholson's arrest, a Kentucky wrecker service towed the eighteen-wheeler, searched it, and maintained its contents in several boxes. The state police told the wrecker service "to hold onto [the truck's contents] and make sure nobody gets around them, [and] that the FBI would be there within a reasonable amount of time to receive them." Despite attempts to recover his belongings, Nicholson was unable to do so because the wrecker

service held the items on the expectation that the FBI would want them.

About six months after the arrest, the FBI obtained warrants to search the F-150 that Nicholson had left in New York and the contents of the eighteen-wheeler maintained by the wrecker service in Kentucky. They found a laptop in New York. In Kentucky, they found a green camera (which held pornographic images), sex toys, and related paraphernalia.

The FBI shipped the New York laptop to the FBI's Birmingham office so that it could be searched. The New York warrant included an attached addendum requiring all searches of electronic material to be completed within sixty days, although it allowed the government to request an extension "upon a showing of good cause." But the receiving FBI agent in Birmingham, unaware that the New York warrant imposed any time limit, did not proceed expeditiously. About four and a half months after receiving the computer and about six months after obtaining a warrant, the FBI imaged the laptop's hard drive and conducted a digital forensic analysis that uncovered child pornography.

### C.    *Nicholson is charged and convicted.*

Nicholson was charged with child pornography and child sex abuse offenses in a six-count indictment in the Northern District of Alabama. Counts One and Two charged him under 18 U.S.C. § 2423(a) with the knowing transportation of a minor in interstate commerce with the intent that the minor "engage in sexual

activity for which a person can be charged with a criminal offense." Count One referenced KM and Count Two referenced JF. Count Three charged traveling in interstate commerce "for the purpose of engaging in illicit sexual conduct with [JF]," a violation of 18 U.S.C. § 2423(b). Count Four charged knowingly transporting by means of interstate commerce child pornography found on the laptop and camera, a violation of 18 U.S.C. § 2252A(a)(1). Count Five charged that Nicholson did "knowingly possess and access with intent to view" a laptop hard drive containing an image of child pornography, "including an image that involved a prepubescent minor and a minor who had not attained 12 years of age," which was transported in interstate commerce in violation of 18 U.S.C. § 2252A(a)(5)(B), (b)(2). And lastly, Count Six charged that Nicholson attempted to and did use, persuade, induce, entice, and coerce a minor, KM, to engage in sexually explicit conduct for the purpose of producing an image of that conduct in a manner affecting interstate commerce, a violation of 18 U.S.C. § 2251(a), (e).

Before trial, Nicholson moved to suppress evidence from the Kentucky and New York searches, arguing that each violated the Fourth Amendment. The district court held a hearing. The FBI's case agent testified that he did not know about the incriminating contents of the eighteen-wheeler until later interviews with JF and KM and that he learned that the wrecker service had kept the items only after an investigation. Both FBI agents at the scene of the arrest testified that they never searched the truck, knew nothing about a wrecker service, gave no instructions to the state

police as to any items in the truck, and had no knowledge of what happened to the truck's contents. The district court denied Nicholson's motion as to the Kentucky search. Relevant to this appeal, the district court found that "[t]he record demonstrates that none of the three FBI agents who testified at the suppression hearing asked Kelly's Wrecker Service to hold the boxes of items taken from [Nicholson's eighteen-wheeler] until agents secured a federal search warrant."

Nicholson renewed his suppression motions at trial. Based on new testimony from employees of the wrecker service that the court found signaled a "purpose . . . to assist law enforcement efforts," it determined that "a Fourth Amendment violation ha[d] occurred" with respect to the Kentucky search. But the court declined to suppress the evidence, stating that "[p]ursuant to *Herring*, because . . . the public interest is so high in a case of this nature involving allegations of sexual abuse of children, the Court . . . overrules the defendant's effort to suppress the evidence." The court took the same approach regarding the New York search, explaining that "[b]ecause the costs in this case are significant . . . the Court should not suppress the evidence" despite a determination that "there was a Fourth Amendment violation with respect to the New York search warrant."

During the trial, the government also sought to admit six old images of KM and JF found in the unallocated space of the camera to show Nicholson's history and relationship with the girls. Unlike the more recent images of child pornography on the camera, these

images had been deleted and were held in the camera's unallocated space. The district court allowed the exhibits to be admitted into evidence and briefly published to the jury. At trial, it became clear that the government had searched the camera's unallocated space only after Nicholson's own expert alerted the government to the presence of additional pictures in that space. And it also became clear that the government could have searched this space earlier, but negligently failed to do so. Based on this revelation, Nicholson argued that these images were protected by the work product privilege and that his defense was prejudiced by allowing the government to introduce evidence that it could have discovered and disclosed long before. He moved for a mistrial or the exclusion of the images in the alternative. The district court denied his motions. But, later, the court excluded the exhibits as cumulative, and instructed the jury that "[t]here were a few exhibits . . . initially admitted into evidence but I have eliminated them from the record: [t]hose are Government's Exhibits 3, 4, 5, 6, 7 and 8, so you will not have those exhibits with you back in the jury room."

At the conclusion of a four-day trial, Nicholson was convicted on all counts and sentenced to concurrent terms of life in prison for Counts One and Two, 360 months for Counts Three and Six, and 120 months for Counts Four and Five. He timely appealed.

## II.    DISCUSSION

Nicholson makes three main arguments, with multiple sub-arguments. First, he argues that the evidence was insufficient to

convict him of three counts: two counts for crimes against JF and one for producing child pornography with KM. Second, he asks for a new trial on the grounds that the district court should have suppressed the evidence from the New York and Kentucky searches. Third, he argues that the district court should have granted a mistrial when it admitted, but then excluded, six images of the girls from the camera's unallocated space. We address each issue in turn.

## A. The Evidence Was Sufficient to Convict Nicholson on Counts Two, Three, and Six.

We begin with Nicholson's challenges to his convictions under Counts Two, Three, and Six of the indictment.

Nicholson first argues that there was insufficient evidence to convict him of the intent element of Counts Two and Three, which charged sex crimes against JF under 18 U.S.C. § 2423. Count Two charged that he transported JF in interstate commerce with the intent that she engage in criminal sexual activity under Florida and North Carolina law. *See* 18 U.S.C. § 2423(a). Both Florida law and North Carolina law criminalize, among other things, oral sex and sexual touching between adults and young children. *See generally* FLA. STAT. § 800.04 (2012); N.C. GEN. STAT. § 14-27.7(a) (2012). Count Three charged interstate travel with the intent to engage in illicit sexual conduct with JF in violation of 18 U.S.C. § 2423(b). "[I]llicit sexual conduct" includes the production of child

pornography and "a sexual act . . . with a person under 18 years of age." 18 U.S.C. § 2423(f).

We will affirm a jury's verdict "if a reasonable trier of fact could conclude that the evidence establishes guilt beyond a reasonable doubt." *United States v. Ortiz*, 318 F.3d 1030, 1036 (11th Cir. 2003) (quoting *United States v. Miles*, 290 F.3d 1341, 1355 (11th Cir. 2002)). We have further explained that a verdict will stand "if there is 'any reasonable construction of the evidence [that] would have allowed the jury to find the defendant guilty beyond a reasonable doubt.'" *United States v. Hough*, 803 F.3d 1181, 1187 (11th Cir. 2015) (quoting *United States v. Friske*, 640 F.3d 1288, 1291 (11th Cir. 2011)).

The crux of Nicholson's argument is that, unlike KM, JF testified that Nicholson did not perform sex acts on her over the course of the trip, including their stops in Florida and North Carolina. The best evidence of what he intended, Nicholson argues, is what actually happened—i.e., no sexual contact with JF. Accordingly, Nicholson argues that no reasonable jury could conclude that he transported JF across state lines with the intent that she engage in criminal sexual activity (Count Two) or the intent to engage in illicit sexual conduct with her (Count Three).

We disagree that the evidence was insufficient to convict on Counts Two and Three. It is true, of course, that some of "the most probative evidence of intent will be objective evidence of what actually happened." *Washington v. Davis*, 426 U.S. 229, 253 (1976) (Stevens, J., concurring). But we have held that the government

need not prove actual sexual activity to convict under Section 2423. *See United States v. Carter*, 776 F.3d 1309, 1322 (11th Cir. 2015); *United States v. Hersh*, 297 F.3d 1233, 1245–46 (11th Cir. 2002). And evidence of actual sex acts is also not the only way to prove the criminal intent to commit those acts. Here, Nicholson ignores powerful evidence that he took JF across state lines for sex-related purposes, even if he never followed through. There is ample evidence that Nicholson sexually abused JF in Alabama, and JF testified that Nicholson's abuse escalated in the time leading up to their trip. Moreover, given that Nicholson took KM on the trip to have sex with her, one could infer that he took JF for the same reason. A reasonable jury could conclude that Nicholson took JF because he intended to engage in sex acts with her.

Next, Nicholson claims that there is insufficient evidence in the record that the Northern District of Alabama is a proper venue for Count Six, which charged the production of child pornography in violation of 18 U.S.C. § 2251(a), (e). Count Six is based on a text message Nicholson sent to KM, then living with Janet Baker in Trussville, Alabama, requesting that she "send him something pretty." KM testified that, based on her experience with Nicholson, she understood the message to be requesting that she send a sexually explicit image of herself. KM complied, sending Nicholson a picture of her vagina.

Nicholson argues that the government introduced insufficient evidence at trial to establish that the text message was sent or received in the Northern District of Alabama. We disagree. "The

Constitution, the Sixth Amendment, and Rule 18 of the Federal Rules of Criminal Procedure guarantee defendants the right to be tried in the district in which the crime was committed." *United States v. Little*, 864 F.3d 1283, 1287 (11th Cir. 2017) (quoting *United States v. Breitweiser*, 357 F.3d 1249, 1253 (11th Cir. 2004)). "But venue need only be proved by a preponderance of the evidence as opposed to beyond a reasonable doubt." *Id.* (internal quotation marks omitted) (quoting *United States v. Rivamonte*, 666 F.2d 515, 517 (11th Cir. 1982)). We have also explained that "there need not be direct proof of venue where circumstantial evidence in the record as a whole supports the inference that the crime was committed in the district where venue was laid." *United States v. Turner*, 586 F.2d 395, 397 (5th Cir. 1978).

Here, trial testimony linked Count Six to the Northern District of Alabama. KM testified that Nicholson communicated with her by text message using a phone that she received only after she was placed into the custody of the Bakers in Trussville, Alabama, a city in the Northern District. KM also testified that Nicholson requested that she take and send the explicit image forming the basis of Count Six using this phone. The record gives us no reason to think that KM, a minor child, would have texted Nicholson from anywhere else than from the district in which she lived at the time. In the light of the whole record, there was sufficient evidence of venue in the Northern District of Alabama for Count Six.

### B. The FBI's Negligence Does Not Justify Excluding the New York or Kentucky Evidence.

Now we turn to the district court's decisions not to suppress the evidence from the New York and Kentucky searches. We address each search in turn.

#### 1. The New York Search

Nicholson argues that the district court should have granted his motion to suppress images of child pornography found on his laptop in New York. He argues that the government failed to follow an addendum appended to the warrant that required that any search of electronic media be completed within sixty days. The government concedes that it searched the laptop outside the sixty-day period but argues that suppression is not warranted because Nicholson was not prejudiced, and the delay was not deliberate.

Our "[r]eview of a district court's denial of a motion to suppress is a mixed question of law and fact." *United States v. Delancy*, 502 F.3d 1297, 1304 (11th Cir. 2007). As such, we accept the district court's factual findings as true unless clearly erroneous, and "review the district court's interpretation and application of the law *de novo.*" *Id.*

The district court found the following facts, which Nicholson does not challenge on appeal. On December 18, 2012, the FBI obtained a search warrant from a magistrate judge in the Northern District of New York authorizing a search of Nicholson's New York

F-150 and "any computers, computer equipment, and/or any other electronic media [present] at the time [of] the search." The warrant included an attached addendum that said in part that "[t]he computer or electronic media search authorized by this warrant shall be completed within sixty (60) days of the date of this warrant. This period may be extended by the court upon a showing of good cause."

The next day, law enforcement executed the warrant, searched the F-150, and seized Nicholson's laptop. The laptop was then shipped to the FBI's Birmingham office, which received it on January 31, 2013. The relevant FBI agent in Birmingham was unaware that the New York warrant imposed a sixty-day limit. About six months after it obtained the warrant, the FBI mirror imaged the laptop's hard drive and conducted a digital forensic analysis. It found child pornography. The government concedes that it neither complied with the addendum nor requested an extension from the magistrate judge.

Nicholson contends that the government's failure to comply with the terms of the addendum necessarily violated the Fourth Amendment and justifies suppressing the evidence gathered from the laptop. We disagree. Although the government did not comply with the temporal limitation in the magistrate judge's order, we cannot say that this failure rises to a Fourth Amendment violation. In contrast to the Federal Rules of Criminal Procedure, the Fourth Amendment "does not specify that search warrants contain expiration dates" and "contains no requirements about when the search

or seizure is to occur or the duration [thereof]." *United States v. Gerber*, 994 F.2d 1556, 1559 (11th Cir. 1993) (emphases omitted). Accordingly, when the police complete a search after the deadline in a warrant, the key constitutional question is whether the probable cause that justified the warrant went stale or dissipated because of the delay. *Id.* at 1560. As relevant here, the circumstances providing the probable cause to search the electronically stored images on a laptop in police custody did not dissipate or go stale over 100 days. *See, e.g.*, *United States v. Touset*, 890 F.3d 1227, 1238 (11th Cir. 2018) (rejecting staleness challenge to search of electronic child pornography); *United States v. Brewer*, 588 F.3d 1165, 1173 (8th Cir. 2009) (passage of several months does not dissipate probable cause for searching "electronically-stored files in the custody of law enforcement"). For this reason, the probable cause that justified the initial seizure of the laptop continued to justify the belated search, and the delay between the seizure of the laptop and the search of the laptop was not constitutionally unreasonable.

Instead of rising to the level of a Fourth Amendment violation, we believe the government's belated search in this case is comparable to a violation of Rule 41 of the Rules of Criminal Procedure, which contains a temporal limitation similar to the magistrate judge's addendum. *See* FED. R. CRIM P. 41. We have held that "noncompliance with Rule 41 requires suppression of evidence only where (1) there was 'prejudice' in the sense that the search might not have occurred or would not have been so abrasive if the rule had been followed, or (2) there is evidence of intentional and

deliberate disregard of a provision in the Rule." *Gerber*, 994 F.2d at 1560 (emphases omitted) (quoting *United States v. Loyd*, 721 F.2d 331, 333 (11th Cir. 1983)).

Applying the same test here, we conclude that suppression is unwarranted. First, Nicholson does not contend that there was prejudice under *Gerber*. The FBI seized the laptop the day after obtaining the warrant. Complying with the addendum would not have stopped the FBI from conducting a digital forensic examination of the laptop nor would it have rendered that examination any less abrasive. Second, there is no evidence of intentional or deliberate disregard for the addendum's temporal limitations. Nicholson acknowledges that the FBI employee in Birmingham who conducted the analysis was simply unaware of the existence or lapse of the sixty-day limitation. In the absence of grounds for suppression under our Rule 41 standard, we conclude that the district court did not err in denying Nicholson's suppression motion as to images found on the laptop.

## 2. The Kentucky Search

Nicholson next argues that evidence resulting from the Kentucky search of the eighteen-wheeler's contents should have been suppressed and that the district court's failure to do so was reversible error. We conclude otherwise.

As an initial matter, the government concedes that the FBI's delay in securing a warrant for the items taken from the Kentucky

truck violated the Fourth Amendment.[1] It is undisputed that the wrecker service refused to release Nicholson's property because it was holding the property for the FBI. *See United States v. Ford*, 765 F.2d 1088, 1090 (11th Cir. 1985) (Fourth Amendment applies to private parties acting as instrument of the government). The Kentucky police, who arrested Nicholson and removed the girls from his custody, told the wrecker service to keep the property because "the FBI would be there within a [couple of days] to receive" it. Of course, the Kentucky police overestimated the FBI. Instead, the FBI did not think to search the items in the truck until much later and, only then, secured a warrant.

Because the government admits that this months-long, government-directed seizure of Nicholson's property violated the Fourth Amendment, the next question is whether the evidence gathered from the eventual warrant-based search of that property should have been suppressed. Suppression is not a "a necessary consequence of a Fourth Amendment violation." *Herring v. United States*, 555 U.S. 135, 141 (2009). Instead, the rule is that a court cannot admit "evidence resulting from a Fourth Amendment violation, unless an exception applies." *United States v. Watkins*, 10 F.4th 1179, 1180 (11th Cir. 2021) (en banc).

---

[1] Although the government asserts that Nicholson lacks standing to challenge the search of one item found in the eighteen-wheeler, a camera, we assume without deciding that Nicholson has standing to contest the search. *See United States v. Ross*, 963 F.3d 1056, 1063 (11th Cir. 2020) (recognizing Fourth Amendment standing as non-jurisdictional).

Citing *Herring*, the government argues that the "good faith exception" to the exclusionary rule applies. The exclusionary rule's "sole purpose . . . is to deter future Fourth Amendment violations." *Davis v. United States*, 564 U.S. 229, 236–37 (2011). And the deterrent value of exclusion corresponds to "the culpability of the law enforcement conduct" in committing the violation. *Herring,* 555 U.S. at 143. "When the police exhibit deliberate, reckless, or grossly negligent disregard for Fourth Amendment rights, the deterrent value of exclusion is strong" enough to warrant exclusion. *Davis*, 564 U.S. at 238 (quotations omitted). But "[w]here the official action was pursued in complete good faith, . . . the deterrence rationale loses much of its force." *United States v. Leon*, 468 U.S. 897, 919 (1984) (quoting *United States v. Peltier*, 422 U.S. 531, 539 (1975)). Accordingly, "[t]o trigger the exclusionary rule, police conduct must be sufficiently deliberate that exclusion can meaningfully deter it, and sufficiently culpable that such deterrence is worth the price paid by the justice system." *Herring*, 555 U.S. at 144. Balancing the benefits of deterrence and the systemic cost of excluding otherwise credible evidence, the Supreme Court has held that merely negligent law enforcement conduct does not justify exclusion. *Id.*

Nicholson argues that the FBI's conduct here was "the exact type of deliberate, reckless, or grossly negligent" action that the exclusionary rule would deter. We disagree. The government did not deliberately violate Nicholson's rights. The Kentucky police reasonably believed that, having arrested Nicholson on a warrant at

the request of the FBI, the FBI would quickly follow-up with a warrant to search the contents of his vehicle. Indeed, any reasonable person would share that belief. The FBI almost certainly had probable cause to search the truck when Nicholson was arrested and obviously had probable cause after the children told them about his sex crimes. But the FBI's investigation was negligent. The FBI did not think to search the truck at the time of the arrest. Later, the FBI did not know that the wrecker service was holding the truck's contents and, when they discovered that it was, did not know the wrecker service was acting on the advice of the Kentucky police. Absent a "systemic error or reckless disregard of constitutional requirements," *id.* at 147, this kind of negligent mistake does not warrant suppression.

For its part, the district court declined to exclude this evidence because it thought the cost of suppression was too high "in a case of this nature involving allegations of sexual abuse of children" and expressly limited its reasoning to "this particular case and this type of crime." Doc. 166 at p. 134. This reasoning, which we are obliged to correct, misunderstands the Supreme Court's case law. The Supreme Court in *Herring* explained that the exclusionary rule and its exceptions weigh the benefits of deterring unconstitutional police conduct and the costs of "letting guilty and possibly dangerous defendants go free." *Herring*, 555 U.S. at 141. But the Court was concerned with general deterrence and system-wide costs, not whether a *particular* police officer would benefit from specific deterrence or whether a *particular* defendant would be

costly to release. *Id.* at 142–43 (explaining that the good faith exception as a rule "reflect[s]" and is "justified by" weighing costs and deterrence benefits). Under *Herring*, therefore, when a court concludes that a constitutional violation was caused by a police officer's good faith mistake, "rather than systemic error or reckless disregard of constitutional requirements," *id.* at 147, the costs of suppressing the evidence necessarily outweigh the benefits. The inverse is also true. And it is true whether the charged crime is murder or jaywalking or something in between.

Finally, even if this evidence should have been suppressed, we believe any error would have been harmless beyond a reasonable doubt under *Chapman v. California*, 386 U.S. 18 (1967). Constitutional errors in a criminal trial "do not require reversal if they are harmless." *United States v. Pon*, 963 F.3d 1207, 1227 (11th Cir. 2020) (internal quotation marks omitted) (quoting *United States v. Roy*, 855 F.3d 1133, 1167 (11th Cir. 2017) (en banc)). A constitutional error is harmless when the government proves "beyond a reasonable doubt that the error complained of did not contribute to the verdict obtained." *Id.* (quoting *Chapman*, 386 U.S. at 22). "To say that an error did not contribute to the verdict is . . . to find that error unimportant in relation to everything else the jury considered on the issue in question, as revealed in the record." *Yates v. Evatt*, 500 U.S. 391, 403 (1991).

Two pieces of evidence were found in the truck: (1) a camera with child pornography and (2) sex toys and similar paraphernalia. Nicholson argues that the images found on the camera were

prejudicial because they formed the basis of Count Four. He argues that he was prejudiced by the admission of the sex toys and related paraphernalia because these items supported the government's position that he took JF and KM across state lines for sex-related purposes.

Even so, we think the admission of this evidence was harmless. Count Four charged the transportation of child pornography via the camera *and the laptop*. As discussed above, the district court did not err in refusing to suppress images of child pornography found on the laptop. So, even if the images found on the camera had been suppressed, the jury would still have been presented with overwhelming evidence of Nicholson's guilt as to Count Four based on images on the laptop's hard drive. Likewise, there was overwhelming evidence that Nicholson had sexual relations with KM and JF before the trip, and KM testified extensively about their relations during the trip. Having reviewed the entirety of the record, we are firmly convinced that the jury would have returned the same verdict even if this evidence had been excluded.

## C. The District Court Did Not Abuse Its Discretion in Denying a Mistrial.

Lastly, Nicholson argues that the district court abused its discretion by denying his request for a mistrial based on the admission and publication of the government's exhibits three through eight, which contained six images of KM and JF. We disagree.

A defendant is entitled to a mistrial only upon a showing of substantial prejudice, and we review a district court's denial of a mistrial for abuse of discretion. *United States v. Chastain*, 198 F.3d 1338, 1351–52 (11th Cir. 1999). Substantial prejudice "occurs when there is a reasonable probability that, but for the alleged error, the outcome of the trial would have been different." *United States v. Capers*, 708 F.3d 1286, 1298 (11th Cir. 2013) (cleaned up) (quoting *United States v. Newsome*, 475 F.3d 1221, 1227 (11th Cir. 2007)). When a defendant's motion arises out of the admission and later exclusion of evidence, "[a]n instruction to disregard evidence withdrawn from the jury is sufficient grounds for an appellate court to uphold a trial court's denial of a motion for mistrial unless the evidence is so highly prejudicial as to be incurable by the trial court's admonition." *United States v. Slocum*, 708 F.2d 587, 598 (11th Cir. 1983). Factors relevant to our consideration of whether evidence creates incurable prejudice include the way the court gives a curative instruction and the existence of other evidence in support of a conviction. *Id.*

As evidence of the nature and history of Nicholson's relationship with the victims, the prosecution sought to admit six images discovered in the unallocated space of the camera recovered from Nicholson's eighteen-wheeler and maintained by the Kentucky wrecker service. These images were discovered by Nicholson's computer expert (perhaps unsurprisingly given its other blunders, the FBI had failed to search the camera's unallocated space), and Nicholson argued that they were barred from being admitted

by the work product doctrine and that they prejudiced his ability to prepare a defense because the government could have, but did not, discover and disclose them much earlier in the litigation.

Assuming for the sake of argument that exhibits three through eight were inadmissible, the district court did not abuse its discretion by denying Nicholson's motion for a mistrial. Although the court declined to declare a mistrial, it excluded the exhibits and instructed the jury that those images would be unavailable during deliberations. Nothing in the record suggests that the admission and brief publication of the images created incurable prejudice. In fact, the court's curative instruction reflected Nicholson's own understanding of "the best way to ameliorate the impact" of the images: "simply . . . say[ing that] those exhibits are no longer in evidence and not to be considered and leav[ing] it at that." Nor has Nicholson disputed the existence of substantial uncontested evidence bearing on the charged offenses, most notably JF and KM's extensive trial testimony. We cannot say that the district court abused its discretion by declining to declare a mistrial based on the temporary admission and brief publication of largely cumulative evidence, especially when it gave the specific curative instruction requested by the defense.

## III.    CONCLUSION

For the foregoing reasons, Nicholson's conviction is **AFFIRMED.**